Gretchen M. Nelson (State Bar No.112566)
Carlos F. Llinás Negret (State Bar No. 284746)
**NELSON & FRAENKEL LLP**
601 South Figueroa St., Suite 2050
Los Angeles, CA 90017
Tel.: 213-943-6089
Fax: 213-622-6019
Email: gnelson@nflawfirm.com
Email: cllinas@nflawfirm.com

*Attorneys for Plaintiffs Iris House, Andrew House and Elton House*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| IRIS HOUSE, ANDREW HOUSE, and ELTON HOUSE, individually, and as heirs, beneficiaries and successors in interest of MICHAEL HOUSE, deceased,<br><br>        Plaintiffs<br><br>    vs.<br><br>PRINCESS CRUISE LINES, LTD, d/b/a PRINCESS CRUISES, Does 1 – 5,<br><br>        Defendants. | CASE NO.:<br><br>**PLAINTIFFS' COMPLAINT**<br><br>**(DEMAND FOR JURY TRIAL)** |

Plaintiffs, IRIS HOUSE, ANDREW HOUSE, and ELTON HOUSE, individually, and as heirs, beneficiaries and successors in interest of MICHAEL HOUSE, deceased, file this Complaint against PRINCESS CRUISE LINES, LTD., d/b/a PRINCESS CRUISES, and Does 1-5, inclusive (collectively "Defendants"), and allege as follows:

///

# **INTRODUCTION**

## **A. The Parties**

1.    At all times material, Plaintiffs, IRIS HOUSE, ANDREW HOUSE and ELTON HOUSE are and were adults and residents of the United Kingdom.

2.    IRIS HOUSE is the surviving wife and successor in interest of decedent, MICHAEL HOUSE.

3.    ANDREW HOUSE is a surviving son and successor in interest of decedent, MICHAEL HOUSE.

4.    ELTON HOUSE is a surviving son and successor in interest of decedent, MICHAEL HOUSE.

5.    Defendant PRINCESS CRUISE LINES, LTD d/b/a PRINCESS CRUISES ("PCL") was and is a for-profit corporation with its world-wide headquarters, principal address, and principal place of business located in the County of Los Angeles, California. PCL was the owner and operator of the vessel *GRAND PRINCESS*.

6.    The full extent of the facts linking the fictitiously designated defendants, Does 1-5, with the causes of action alleged herein are unknown to the Plaintiff, and the true names and capacities, whether individual, plural, corporate, partnership, associate, or otherwise of Does 1-5, inclusive, are unknown to Plaintiffs. Plaintiffs therefore sue said defendants by such fictitious names.  The Plaintiffs are informed and believe that each of the defendants designated herein as a "Doe" is negligently, wantonly, recklessly, tortuously and unlawfully responsible in some manner for the events and happenings herein referred to, and/or is strictly liable in tort for injuries and damages with respect to Plaintiffs as herein alleged. Plaintiffs will hereafter ask leave of Court to amend this Complaint to show said defendants' true names and capacities and to state the manners in which each fictitious defendant is so responsible when the same have been ascertained.

**B. Jurisdiction**

7.     This Court has diversity jurisdiction over Plaintiffs' claims under 28 U.S.C. §1332 because the amount in controversy exceeds seventy-five thousand dollars ($75,000). Plaintiffs are citizens of a foreign country and Defendant, PCL, has its principal place of business in this state.

8.     In the alternative, this Court has jurisdiction over Plaintiffs' claims under the maritime and admiralty jurisdiction of the Court, pursuant to Article III, §2 of the United States Constitution, delegating jurisdiction over admiralty cases to the federal courts, and 28 U.S.C. §1333.

9.     Federal admiralty jurisdiction extends to all navigable waters, salt or fresh, with or without tides, natural or artificial, which are in fact navigable. The term 'navigable waters' means a body of water which, in its present configuration, constitutes a highway of commerce, between the states or with foreign countries. *See Complaint of Paradise Holdings, Inc.,* 795 F.2d 756 (9th Cir. 1986) ("To invoke federal admiralty jurisdiction in tort cases, the tort must occur on navigable waters and bear a significant relationship to traditional maritime activity.").

10.     At all times material, the incidents alleged in this Complaint occurred while the vessel was on navigable waters.

**C. Venue**

11.     Venue is proper in the Central District of California pursuant to 18 U.S.C. §1965 and 28 U.S.C. §1391, and because (1) Defendant PCL is found and transacts business in this district; (2) Defendant PCL maintains a physical presence and its principal place of business in Los Angeles County within this district; and (3) The passenger-ticket issued to Plaintiff IRIS HOUSE and decedent MICHAEL HOUSE by PCL contains a forum selection clause, that PCL asserts requires all claims to be filed in this United States District Court.

///

## D. Personal Jurisdiction

12.     Defendant PCL, at all times material hereto, personally or through an agent:

    a.  Maintained its principal place of business in this state and county;

    b.  Operated, conducted, engaged in or carried on a business venture in this state and or county; and/or;

    c.  Was engaged in substantial activity within this state; and/or

    d.  Operated vessels in the waters of this state; and/or

    e.  Purposefully availed itself of the benefits of conducting activities in California by directing its activities toward this state, thereby obtaining the benefits and protections of this state's laws.

13.     PCL was engaged in the business of providing to the public, and Plaintiff IRIS HOUSE and decedent MICHAEL HOUSE in particular, for compensation, vacation cruises aboard its vessels which travel worldwide.

## GENERAL ALLEGATIONS

### Introduction

14.      At all times material hereto, PCL owned, operated, managed, maintained and/or controlled the vessels, *DIAMOND PRINCESS* and *GRAND PRINCESS*.

15.     Between February 1, 2020 and February 19, 2020, 700 passengers were infected - and 8 passengers were killed - after a COVID-19 outbreak on the PCL cruise ship *DIAMOND PRINCESS*, while transiting through Vietnam, Taiwan, Hong Kong and Japan.

16.     Despite its awareness of the unique risks created by the cruise ship environment, and its recent experience with a COVID-19 outbreak on other vessels including the *DIAMOND PRINCESS*, PCL continued to do business as usual, sailing its other vessels around the world, failing to cancel itineraries, failing to notify passengers of the extent of the outbreak on the PCL fleet, and failing to implement

adequate measures to mitigate the spread of COVID-19 on the rest of the fleet, including the *GRAND PRINCESS*.

17. Despite its awareness of the unique risks created by the cruise ship environment, and its recent experience with a COVID-19 outbreak on other vessels including the *DIAMOND PRINCESS*, on February 21, 2020, PCL operated a roundtrip voyage from San Francisco to Hawaii aboard the *GRAND PRINCESS*.

18. At all times material, Plaintiff IRIS HOUSE and decedent MICHAEL HOUSE were paying passengers on the *GRAND PRINCESS*, on a fifteen (15) day itinerary, beginning on February 21, 2020, departing from San Francisco, California, and making scheduled stops in and around the Hawaiian Islands (hereinafter "Hawaii Cruise").

19. For the duration of the entire Hawaii Cruise, all of the scheduled ports of call were in the United States, within the territorial limits of Hawaii and within the territorial limits of California.

20. At the time of the cruise, decedent MICHAEL HOUSE was 71 years old, and Plaintiff IRIS HOUSE was 69 years old.

21. Unbeknownst to Mr. and Mrs. House, prior to their embarkation on the the Hawaii Cruise, a COVID-19 outbreak had begun to spread between passengers and crew on the *GRAND PRINCESS*, during the prior itinerary along the western coast of Mexico (hereinafter "Mexican Riviera Cruise").

22. The *GRAND PRINCESS* had departed for the prior Mexican Riviera Cruise on February 11, 2020, from San Francisco for ten (10) days, through February 21, 2020.

23. On or about February 19, 2020, PCL became aware of at least one passenger suffering from COVID-19 symptoms aboard the Mexican Riviera Cruise.

24. According to PCL's Chief Medical Officer, Grant Tarling, MD MPH ("Dr. Tarling") PCL believed the infected passenger was already carrying the virus when he boarded the *GRAND PRINCESS* on February 11, 2020.

25.     Dr. Tarling reported the infected passenger sought medical treatment from the medical center onboard the *GRAND PRINCESS* on February 20, 2020. The passenger reported suffering from "acute respiratory distress" for about a week before seeking treatment.

26.     Upon its return to San Francisco, on February 21, 2020, a passenger originally from Placer County, California (hereinafter "Placer County Passenger") who had been on the *GRAND PRINCESS* during the Mexican Riviera cruise, disembarked. 6 days later, on February 27, 2020, this passenger was hospitalized, tested positive for COVID-19 and, on March 4, 2020, became California's first reported death from the virus.[1]

27.     Another passenger, originally from Marin County, California (hereinafter "Marin County Passenger"), also exposed to COVID-19 during the Mexican Riviera Cruise, disembarked on February 21, 2020, was reported on March 9, 2020, as Marin County's first COVID-19 positive case, and on March 27, 2020, became Marine County's first COVID-19 death.[2]

28.     Another passenger, originally from Sonoma County, California, (hereinafter "Sonoma County Passenger"), also exposed to COVID-19 during the Mexican Riviera Cruise, disembarked on February 21, 2020, and on March 4, 2020, was reported as the first COVID-19 positive case in Sonoma County.[3]

29.     Upon information and belief, at least three other passengers on the *GRAND PRINCESS's* Mexican Riviera Cruise suffered from COVID-19 symptoms while on the vessel, likely exposing dozens of other passengers to the virus.

30.     On or about February 21, 2020, after the turnaround process was completed, the *GRAND PRINCESS* departed for the second, fifteen (15) night Hawaii

---

[1] https://www.placer.ca.gov/6438/Death-of-patient-with-COVID-19
[2] https://sanfrancisco.cbslocal.com/2020/03/27/coronavirus-grand-princess-passenger-confirmed-marin-county-first-covid-19-death/
[3] https://sonomacounty.ca.gov/COVID-19-Health-Alert-for-Grand-Princess-Cruise-Passengers/

Cruise, with nearly 2,500 people on board, including Plaintiff IRIS HOUSE and decedent MICHAEL HOUSE.[4]

31.     68 passengers, and over 1,000 crew members remained onboard the *GRAND PRINCESS* from the prior Mexican Riviera Cruise, to continue traveling on the ship's next voyage.

32.     Upon information and belief, many of the 68 passengers (and many of the 1,000 + crew) who remained from the prior itinerary, contracted COVID-19 during the Mexican Riviera Cruise. These remaining passengers and crew ultimately exposed new passengers embarking on the Hawaii Cruise, including Plaintiff IRIS HOUSE and decedent MICHAEL HOUSE.

33.     Despite its awareness of the unique risks created by the cruise ship environment, and its recent experience with a COVID-19 outbreak on other vessels including the *DIAMOND PRINCESS*, PCL:

   a. Failed to implement any effective COVID-19 medical screening or examination procedures for crew or passengers embarking on the Mexican Riviera Cruise, on February 11, 2020;

   b. Failed to implement any effective COVID-19 medical screening or examination procedures for crew or passengers who remained onboard from the Mexican Rivera Cruise, and were continuing on for the Hawaii voyage on February 21, 2020;

   c. Allowed and encouraged the remaining 68 passengers (and 1,000 + crew) from the Mexican Riviera Cruise to roam freely around the ship, congregate, interact, and be in close contact with the new Hawaii Cruise passengers;

   d. Failed to initiate effective measures to sanitize or disinfect the vessel in-between voyages;

---

[4]  The turnaround process is the standard operation of every cruise ship in which – on a single 6 hour period thousands of passengers from the prior itinerary disembark the vessel, and thousands of new passengers embark on the vessel for the new itinerary.

e.  Failed to implement any procedures for screening or testing existing or new passengers boarding the ship for the Hawaii-bound voyage;

f.  Failed to notify passengers who were scheduled to board the vessel on February 21, 2020, that passengers from the prior Mexico trip had reported COVID-19 symptoms, or of the fact that passengers remaining on board the *GRAND PRINCESS* had been exposed to and might be infected with and/or carrying the virus.

34.    With the known likely presence of the virus in passengers and crew members who remained on the ship, the ship should have never sailed on to Hawaii.

35.    Between February 26, 2020 and February 29, 2020, the *GRAND PRICESS* exclusively navigated and berthed *within* the 3-mile territorial waters of the State of Hawaii, making scheduled stops in the ports of call of Kauai (February 26), Honolulu/Oahu (February 27), Mauri (February 28), and Hilo (February 29).

36.    Between February 26, 2020 and February 29, 2020, while the *GRAND PRINCESS* exclusively navigated and berthed within the territorial waters of the State of Hawaii, Plaintiff IRIS HOUSE and decedent MICHAEL HOUSE had meals in crowded dining rooms/restaurants, and participated in onboard activities in crowded casinos, lounges and theaters – exposing them to COVID-19 infected crew members and passengers *within* the 3-mile territorial waters of the State of Hawaii. These activities repeatedly involved interactions within 6 feet of other potentially infected people's aerosols and viral particles. They included:

a.  On or about February 26, 2020, while in Kauai, Hawaii, Plaintiff IRIS HOUSE and decedent MICHAEL HOUSE attended a crowded dining area for breakfast at the *GRAND PRINCESS*;

b.  On or about February 26, 2020, while in Kauai, Hawaii, Plaintiff IRIS HOUSE and decedent MICHAEL HOUSE attended a crowded dining area for lunch at the *GRAND PRINCESS*' Deck 14 (Lido/Pool area);

c.  On or about February 26, 2020, while in Kauai, Hawaii, Plaintiff IRIS HOUSE and decedent MICHAEL HOUSE attended a crowded dining

area for a meal at the *GRAND PRINCESS*' Vista Lounge (an enclosed area with capacity for 457 people);

d.  On or about February 26, 2020, while in Kauai, Hawaii, Plaintiff IRIS HOUSE and decedent MICHAEL HOUSE attended a crowded film at the *GRAND PRINCESS*' poolside amphitheater;

e.  On or about February 27, 2020, while in Oahu, Hawaii, Plaintiff IRIS HOUSE and decedent MICHAEL HOUSE attended a crowded dining area for breakfast at the *GRAND PRINCESS* (seating 480 + passengers);

f.  On or about February 27, 2020, Plaintiff IRIS HOUSE and decedent MICHAEL HOUSE attended a PCL sponsored excursion to Oahu, Hawaii (booked through the ship's excursion desk) with other 60-70 PCL passengers on a crowded and enclosed bus;

g.  On or about February 27, 2020, while in Oahu, Hawaii, Plaintiff IRIS HOUSE and decedent MICHAEL HOUSE attended a crowded dining area for breakfast at the *GRAND PRINCESS* (seating 480 + passengers);

h.  On or about February 28, 2020, while in Mauri, Hawaii, Plaintiff IRIS HOUSE and decedent MICHAEL HOUSE boarded a crowded and enclosed *GRAND PRINCESS* tender/lifeboat, transporting PCL passengers and crew from the cruise ship to shore (with crew repeatedly physically touching passengers during the trip to steady them);

i.  On or about February 28, 2020, while in Mauri, Hawaii, Plaintiff IRIS HOUSE and decedent MICHAEL HOUSE had a meal at a crowded dining room at the *GRAND PRINCESS* (seating 480 + passengers);

j.  On or about February 28, 2020, while in Mauri, Hawaii, Plaintiff IRIS HOUSE and decedent MICHAEL HOUSE attended a crowded performance at the *GRAND PRINCESS*' indoor theater on the Deck 6 (seating 800 passengers);

k.  On or about February 28, 2020, while in Mauri, Hawaii, Plaintiff IRIS HOUSE and decedent MICHAEL HOUSE had drinks at a crowded bar on Deck 6 at the *GRAND PRINCESS*;

l.  On or about February 29, 2020, while in Hilo, Hawaii, Plaintiff IRIS HOUSE and decedent MICHAEL HOUSE sunbathed on the crowded Lido Deck at the *GRAND PRINCESS*.

37.  Between February 26, 2020 and February 29, 2020, while the *GRAND PRINCESS* exclusively navigated and berthed within the territorial waters of the State of Hawaii, Plaintiff IRIS HOUSE and decedent MICHAEL HOUSE had meals in crowded dining rooms/restaurants, and participated in onboard activities in crowded casinos, lounges and theaters, alongside COVID-19 infected passengers and crew, including but not limited to:

a.  COVID-19 infected people from the group of 68 passengers from the prior Mexican Riviera Cruise; and/or

b.  COVID-19 infected people from the group of approximately 1,111 crew from the prior Mexican Riviera Cruise; and/or

c.  COVID-19 infected people on the Hawaii Cruise, who interacted with, and were infected by, crew and passengers from the prior Mexican Riviera Cruise; and/or

d.  The COVID-19 infected Sonoma County Passenger and/or crew and passengers who interacted with, and were infected by, the Sonoma County Passenger; and/or

e.  The COVID-19 infected Placer County Passenger and/or crew and passengers who interacted with, and were infected by, the Sonoma County Passenger; and/or

f.  The COVID-19 infected Marin County Passengers and/or crew and passengers who interacted with, and were infected by, the Marin County Passenger.

Plaintiff's Complaint and Demand for Jury Trial

38.     On or about March 3 and 4, 2020, decedent MICHAEL HOUSE began to experience the following physical symptoms of COVID-19: a prolonged, dry, and persistent cough accompanied with shortness of breath. Days later, as the cough and shortness of breath worsened, decedent MICHAEL HOUSE experienced high fevers, and tiredness. Decedent MICHAEL HOUSE tested positive for COVID-19, was diagnosed with pneumonia, and died on March 29, 2020. The official cause of death was COVID-19.

39.     Based on clinical studies, the median incubation period for COVID-19 is 5.1 days (in 95% of infections).[5] Accordingly, because decedent MICHAEL HOUSE developed symptoms on or about March 3, 2020 and March 4, 2020, he was exposed to – and contracted - COVID-19, during the time that the *GRAND PRINCESS* was within the 3-mile territorial waters of the State of Hawaii, between February 26, 2020 and February 29, 2020.

40.     On or about March 3, 2020, Plaintiff IRIS HOUSE and Decedent MICHAEL HOUSE participated in a crowded *GRAND PRINCESS* 'Murder Mistery' event, in the ship's Explorer's Lounge (capacity 274 people).  During this event, PCL crew and entertainers repeatedly touched and physically interacted with passengers, passing pens and paper from passenger to passenger.

41.     Beginning on or about March 11, 2020, Plaintiff IRIS HOUSE experienced the following symptoms: high fever. Later she lost her sense of taste. Subsequent laboratory tests of Plaintiff IRIS HOUSE showed she contracted COVID-19 and developed COVID-19 antibodies.

42.     Based on clinical studies, the median incubation period for COVID-19 is 5.1 days (in 95% of infections). [6] Accordingly, because Plaintiff IRIS HOUSE

---

[5] Stephen A. Lauer & Kyra H. Grantz, *The Incubation Period of Coronavirus Disease 2019 (COVID-19)*, Annals of Internal Medicine, May 5, 2020. (www.ncbi.nlm.nih.gov/pmc/articles/PMC7081172/

[6] Stephen A. Lauer & Kyra H. Grantz, *The Incubation Period of Coronavirus Disease 2019 (COVID-19)*, Annals of Internal Medicine, May 5, 2020. (www.ncbi.nlm.nih.gov/pmc/articles/PMC7081172/

developed symptoms beginning on or about March 11, 2020, she contracted COVID-19 during her cruise on the *GRAND PRINCESS*.

43.     As alleged in greater detail below, as a direct and proximate result of PCL's reckless and negligent failure to mitigate the spread of COVID-19 on the *GRAND PRINCESS*, and PCL's reckless and negligent management of the outbreak on the PCL fleet, Plaintiff IRIS HOUSE contracted COVID-19.

44.     As alleged in greater detail below, as a direct and proximate result of PCL's reckless and negligent failure to mitigate the spread of COVID-19 on the *GRAND PRINCESS*, and PCL's reckless and negligent management of the outbreak on the PCL fleet, MICHAEL HOUSE contracted COVID-19 in the territorial waters of the State of Hawaii, and subsequently lost his life.

45.     As alleged in greater detail below, following the catastrophic outbreak on the *DIAMOND PRINCESS* from January 20 through February 18, PCL failed to properly and promptly implement a cruise ship mitigation and response plan, as outlined in the February 13, 2020, "Guidance for Ships on Managing Suspected Coronavirus Disease 2019" issued by the CDC.

46.     As noted in greater detail below, following the catastrophic outbreak on the *DIAMOND PRINCESS* from January 20 through February 18, PCL failed to promptly terminate/cancel the rest of its itineraries and fleet operations worldwide.

47.     Instead, PCL continued business as usual in the rest of its fleet world-wide. Following the outbreak on the *DIAMOND PRINCESS*, activities on the rest of PCL's cruises, including the *GRAND PRINCESS*, continued uninterrupted: mass gatherings in onboard casinos, theaters, buffet lines, dining areas, nightclubs, bars, restaurants, and housekeeping visits.

48.     PCL's decision to prioritize profits over safety, lead to foreseeable catastrophic outbreaks in the rest of PCL's fleet, including the *GRAND PRINCESS* (February 11, 2020 – March 12, 2020), *RUBY PRINCESS* (March 8, 2020 – March 19, 2020,), and *CORAL PRINCESS* (March 8, 2020 – April 8, 2020).

49.    The *DIAMOND PRINCESS* and *GRAND PRINCESS* had more than 800 COVID-19 cases and 10 deaths, including decedent MICHAEL HOUSE.[7]

50.    The *RUBY PRINCESS* had approximately 900 COVID-19 cases, including 28 deaths.[8]

### History of Communicable Disease, Respiratory illness, and Unsanitary Conditions on Cruise Ships, Prior to the 2020 COVID-19 Pandemic

51.    The term quarantine has maritime origins, coming from *quaranta giorni*, Italian for "forty days," the length of time ships from infected ports had to anchor in Venice during the 14th century bubonic plague pandemic.[9]

52.    During the 18th and 19th centuries, yellow fever scares led to ships being put under quarantine, raising a "yellow flag" during the day, and shining a light at night until it was safe to enter the ports.[10]

53.    Thus, the spread of highly infectious viruses and communicable diseases (and subsequent quarantines) have been a foreseeable problem to the commercial shipping and passenger vessel industry for centuries.

54.    Just like when the sinking of the *RMS Titanic* led to the widespread implementation of safety measures like the modern muster drill and ensuring sufficient lifeboats for every passenger and crewmember; the cruise line industry has had decades to implement effective measures to mitigate the spread of foreseeable respiratory and communicable illnesses on their ships.

55.    The occurrence of typhoid fever and shigellosis on cruise liners in the early 1970s led to the establishment of the Vessel Sanitation Program (VSP) by the

---

[7] Leah F. Moriarty, *Public Health Responses to COVID-19 Outbreaks on Cruise Ships – Worldwide, February – March 2020*, Mach 27, 2020 (https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm)

[8]   *Report, Special Commission of Inquiry into the Ruby Princess*, New South Wales Australia, August 14, 2020.

[9]  Eugenia Tognotti, *Lessons from the History of Quarantine, from Plague to Influenza A*, Emerging Infectious Diseases Journal, CDC, February 2013. (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3559034/).

[10]  https://time.com/5799525/coronavirus-covid19-quarantine-ships-history/

CDC in 1975.[11] The aim of this cooperative program is to minimize the risk of communicable diseases on cruise ships by maintaining a high degree of sanitation.

56.     The VSP conducts random unannounced twice-yearly inspections on cruise ships carrying 13 or more passengers docking at U.S. ports. The aim of the inspection is to determine the presence of vermin, contaminated food or water, or other unsanitary conditions that may lead to the introduction, spread, or transmission of infectious diseases. The ships are rated on various factors that can impact this such as (i) water sanitation, (ii) food handling and preparation, (iii) personal hygiene and sanitation practices by the ship staff, (iv) pool and spa sanitation, (v) potential for food and water contamination and disinfection, and (vi) general cleanliness.[12]

57.     Under the VSP each cruise ship is given a score. A score of 86 or higher (out of 100) denotes an acceptable level of sanitation.[13]

58.     On February 2, 2020, during the onset of the COVID-19 outbreak, the PCL vessel *Regal Princess*, was given a score of 77. During the random inspection, the CDC report found 22 violations, including: unreported cases of acute gastroenteritis (due to sick employees handling food); children with diapers allowed to swim freely on pools; a male bakery employee with 10mm fingernails, containing dark debris on the underside of several fingernails, handling food items; a previously used empty container of food used on the buffet line that was stored on the bread preparation counter top; a  heavily soiled bulkhead light above a buffet waiter station.[14]

59.     Prior to that, other vessels in PCL's fleet received unsatisfactory VSP inspection scores, including the *Crown Princess* on April 8, 2017 (score 84), the

---

[11] D.G. Addis, J.C. Yashuk, D.E. Clapp, *Outbreaks of diarrhoeal illness on passenger ships*, *1975-85*, Epidn. Inf. (1989) (https://www.cambridge.org/core/services/aop-cambridge-core/content/view/1738F8027A6C59D925FDC8FDDDD44719/S0950268800030363a.pdf/outbreaks_of_diarrhoeal_illness_on_passenger_cruise_ships_197585.pdf).

[12] Vivek Kak, Infections on Cruise Ships, Microbiology Spectrum, August 7, 2015.

[13] *Id.*

[14] Regal Princess, 02/05/2020 Inspection Detail Report, Vessel Sanitation Program, CDC.

*Golden Princess* on February 7, 2013 (score 81), and the *Sea Princess* on January 9, 1999 (score 83).[15]

60.     Other sister vessels in the fleet received unsatisfactory VSP inspection scores between 2013 – 2019, including: the *Carnival Fantasy* on July 18, 2019 (score 77), the *Carnival Liberty* on January 4, 2018 (score 80), the *Carnival Breeze* on December 10, 2017 (score 77), the *Carnival Vista* on December 2, 2017 (score 79), the *Carnival Sunrise* on November 11, 2017 (score 78), the *Carnival Paradise* on June 15, 2017 (score 83), the *Carnival Legend* on April 23, 2017 (score 83), the *Carnival Fascination* on October 16, 2016 and February 21, 2013 (score 84), and the *Holland America Veendam* on August 19, 2012 (score 77).[16]

61.     In addition to the VSP, the Public Health Act (42 U.S.C. §269), also authorizes the CDC to take measures to prevent the introduction into the United States of "any communicable disease by securing the best sanitary condition on such vessels, their cargoes, passengers, and crews."

62.     The World Health Organization's (WHO) International Health Regulations (IHR) provide international standards for ship and port sanitation and provide a core framework for most countries to detect, assess, notify, and respond to public health threats at ports as well as airports and certain ground crossings.

63.     A modern cruise ship is a traveling city with a common food and water supply, shared sanitation and air-conditioning systems, and a large number of individuals traveling together.[17]

64.     With populations in the thousands, the individuals are often from different cultures, with different immunization backgrounds and health statuses. A typical cruise ship has a passenger-to-crew ratio of around 3 to 1. Cruise ships employ

---

[15]Cruise Ships Inspection Score Search Results, Princess Cruises, Vessel Sanitation Program, CDC.

[16]Cruise Ships Inspection Score Search Results, Carnival, Vessel Sanitation Program, CDC.

[17] Vivek Kak, *Infections on Cruise Ships*, Microbiology Spectrum, August 7, 2015.

crew from around the world: on average, 50 nationalities will be represented in a crew of 1,200.[18]

65.    At the time of the COVID-19 outbreak, the *DIAMOND PRINCESS* had 3,711 persons, comprised of 1,045 crew (from 48 countries) and 2,666 passengers (from 36 countries).[19]

66.    At the time of the COVID-19 outbreak on the Hawaii Cruise, the *GRAND PRINCESS* had 3,571 persons, comprised of 1,111 crew (from 44 countries) and 2,460 passengers (from 24 countries).[20]

67.    The proximity of passengers as well as crew members in semi-enclosed spaces, with interactions in crowded dining halls and recreational rooms, spas, and pools increases the possibility of organisms being transmitted among them.[21]

68.    At the same time, an infecting agent has the potential to enter the food or water supply or the sanitation systems in these ships to be distributed widely across the ship, and to cause significant morbidity and/or mortality.[22]

69.    The isolated environment on a cruise ship, with close interaction between a vast cohort of individuals, increases the risk of being exposed to various respiratory secretions and, potentially, to infectious respiratory viruses. The presentation of these infections is nonspecific and can range from an upper respiratory tract infection to life-threatening pneumonia.[23]

70.    A study of the epidemiology of injuries and illnesses among passengers on cruise ships revealed that upper respiratory infections were the most frequent

---

[18] Kak, Supra.

[19] Leah F. Moriarty, *Public Health Responses to COVID-19 Outbreaks on Cruise Ships – Worldwide, February – March 2020*, Mach 27, 2020 (https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm)

[20] Moriarty, *COVID-19 Outbreaks on Cruise Ships*, supra.

[21] Kak, *Infections on Cruise Ships*, supra.

[22] *Id.*

[23] *Id.*

diagnosis on cruise ship medical facilities. 19%–29% of passengers seeking medical attention were diagnosed with a respiratory illness.[24]

71.     The typical cruise passenger is often an elderly individual and may have chronic illnesses, which can make him or her more susceptible to infection and its complications. The median cruise ship passenger is 45 years old.[25] Roughly half of passengers who seek medical care are older than 65 years of age.[26]

72.     The median age of passengers on the *DIAMOND PRINCESS* during the Covid-19 outbreak (January – February 2020) was 69 years.[27]

73.     The median age of passengers on the *GRAND PRICESS* Hawaii Cruise was 68 years.[28] At the time of the cruise, decedent MICHAEL HOUSE was 71 years old, and Plaintiff IRIS HOUSE was 69 years old.

74.     Leading up to 2020, there were well-documented reports of both influenza A and influenza B outbreaks on cruise ships. These infections had a high attack rate, with a large number of individuals being infected before the epidemic was contained. The outbreaks can occur year-long on cruise ships, because individuals from different hemispheres introduce the virus into the cruise ship population. [29] Significant outbreaks included:

   a.  A June 23-July 5, 2000 outbreak of respiratory illnesses (influenza B virus) on the *MS Rotterdam* (operated by PCL's sister company, Holland America Line Cruises) during a 12-day Baltic cruise from the United Kingdom to Germany via Russia. The ship carried 1311 passengers, primarily from the United States;[30]

---

[24] *Id.*
[25] *Id.*
[26] Kara Tardivel, Stefanie B. White, Krista Kornylo Duong, *Travelers Health Yellow Book*, Chapter 8, Cruise Ship Travel, CDC.
[27]  Moriarty, *COVID-19 Outbreaks on Cruise Ships*, supra.
[28] *Id.*
[29] Kak, *Infections on Cruise Ships*, supra.
[30] Influenza B virus outbreak on cruise ship-Northern Europe, 2000, Centers for Disease Control and Prevention (https://pubmed.ncbi.nlm.nih.gov/11393483/)

17

b. A May 2009, pandemic (H1N1) virus or the influenza A (H3N2) infection of 1970 passengers and more than 730 crew members on cruise ships.[31]

75. Among the bacterial pathogens that cause respiratory infections on cruise ships, the most common infections reported have been due to Legionella species. The symptoms of the disease often include fevers, chills, and a cough with expectoration, and individuals with chronic medical problems or older age (>65) have a higher risk of developing the disease.[32]

76. Leading up to 2020, there were multiple incidents of Legionnaires' disease associated with cruise ships, with the largest confirmed cluster involving 50 cases spread over 9 cruises of a single ship. Like COVID-19, manifestation of symptoms is delayed, which in the case of Legionnaires generally occur 2 to 10 days after exposure.[33]

77. On August, 2016, the CDC issued its Guidance for Cruise Ships on Influenza-like Illness ("ILI") Management. The document "provides guidance for cruise ships originating from, or stopping in, the United States to help prevent, diagnose, and medically manage influenza-like illness."[34] Citing studies of ILI outbreaks on cruise ships in 1987, 1988, 1997, 1998, 1999, 2000, and 2009, the CDC's guidance warns that "the primary mode of influenza virus transmission is through respiratory droplets that are spread from an infected person through coughing or sneezing to a susceptible close contact within about 6 feet," and makes specific recommendations to mitigate outbreaks, including:

---

[31]Nan Zhang, Ruosong Miamo, Hong Huang & Emily Y. Chang, *Contact infection of Infectious disease on board a cruise ship,* Scientific Reports, December 8, 2016.

[32]Kak, *Infections on Cruise Ships*, supra.

[33]*Id.*

[34] *Guidance For Cruise Ships On Influenza-like Illness (ILI) Management*, Quarantine and Isolation, Cruise Ship Guidance, Management of Ill Passengers/Crew (https://www.cdc.gov/quarantine/cruise/management/guidance-cruise-ships-influenza-updated.html).

a.  Early identification and isolation of crew members and passengers with ILI;

b.  Wide distribution of alcohol-based hand sanitizer;

c.  Passengers with ILI should remain isolated in their cabins or quarters;

d.  Crewmembers with ILI should notify their supervisors, report to the infirmary for medical evaluation, remain isolated in their cabins or quarters;

e.  Passengers and crew members with ILI should be encouraged to remain as far away from others as possible (at least 6 feet), and either wear face masks or cover their mouths and noses with a tissue;

f.  Passengers and crew members who may have been exposed to a person suspected of having ILI should monitor their health for 4 to 5 days after the exposure;

g.  A combination of measures can be implemented to control ILI outbreaks, including isolation, infection control efforts, crew member and passenger notifications, and active surveillance for new cases;

h.  Crew members whose work activities involve contact with passengers and other crew members who have ILI, should 1) maintain a distance of 6 feet from the sick person while interviewing, escorting, or providing other assistance, 2) keep interactions with sick people as brief as possible, 3) limit the number of people who interact with sick people, 4) avoid touching eyes, nose and mouth, 5) washing hands often with soap and water for 20 seconds (or if unavailable, hand sanitizer), 6) wearing a face mask;

i.  Sick persons should receive care and meals from a single person;

j.  Crew members and other staff who may have contact with people with ILI should be instructed in the proper use, storage, and disposal of

personal protective equipment (PPE). Improper use or handling of PPE can increase disease transmission risk;

k.  Crew members should wear impermeable, disposable gloves if they need to have direct contact with sick people or potentially contaminated surfaces, rooms, or lavatories used by sick passengers and crew members;

l.  Crew members should wash their hands with soap and water or use an alcohol-based hand sanitizer after removing gloves;

m. Used gloves should be discarded in the trash and should not be washed or saved for reuse;

n.  Crew members should avoid touching their faces with gloved or unwashed hands;

o.  Crew members who use N95 respirators should receive annual fit testing;

p.  Crew members who provide health care to passengers or other crew members (e.g., onboard nurses and physicians) should follow CDC's prevention strategies for seasonal influenza in health care settings'

q.  Ships should ensure availability of conveniently located dispensers of alcohol-based hand sanitizer;

r.  Where sinks are available, ships should ensure that supplies for handwashing (i.e., soap, disposable towels) are consistently available;

s.  Ships should carry a sufficient quantity of PPE, such as face masks, N95 respirators, and disposable gloves, for use in controlling the spread of influenza or other diseases;

t.  Ships should carry a sufficient quantity of medical supplies to meet day-to-day needs. Contingency plans are recommended for rapid resupply during outbreaks;

u.  Carrying sterile viral transport media and sterile swabs to collect nasopharyngeal and nasal specimens;

v.  During ILI outbreaks, more frequent cleaning of commonly touched surfaces such as handrails, countertops, and doorknobs. Surfaces contaminated by the respiratory secretions of a sick person (e.g., in the sick person's living quarters or work area, and in isolation rooms) should also be cleaned.

78.   Leading up to 2020, the CDC also mandated that cruise ships report cases of influenza-like illness on each voyage, and provided guidance for management of influenza outbreaks and for patients with severe influenza.[35]

**PCL's Medical Capabilities**

79.   In light of the large number of passengers and crew traveling on a modern cruise ship at any given time, operators such as PCL, have fully staffed state-of-the art medical facilities on board each vessel.

80.   The American College of Emergency Physicians Health Care Guidelines for Cruise Ship Medical Facilities ("ACEP Guidelines"), originally approved in 1995 and revised periodically thereafter, defines the physical parameters and equipment on board shipboard medical facilities. These requirements are very specific and include equipment for airway intubation and management, cardiac monitors, EKGs, infusion devices, defibrillators, respiratory support, laboratory blood testing, and x-rays.[36]

81.    The ACEP Guidelines have been adopted as "industry-wide guidelines" by the members of the Cruise Lines International Association ("CLIA"), including PCL.[37]

82.   The Cruise Vessel Security and Safety Act, 46 U.S.C.A. §§ 3507, 3508, enacted in 2010, mandates that cruise ships carry "medical staff," with at least 3 years

[35]   Guidance For Cruise Ships On Influenza-like Illness (ILI) Management, Quarantine and Isolation, Cruise Ship Guidance, Management of Ill Passengers/Crew (https://www.cdc.gov/quarantine/cruise/management/guidance-cruise-ships-influenza-updated.html).
[36]   Robert D. Peltz, *Has Time Passed Barbetta By,* University of San Francisco Maritime Law Journal, 24 U.S.F. Mar. L.J. 1 (2012).
[37]https://cruising.org/en/about-the-industry/policy-priorities/clia-oceangoing-cruise-line-policies/health

of post-graduate or post-registration clinical practice or board certification in emergency medicine.

83.    In the case of PCL, each of these ship medical facilities are under the strict supervision and real time control by the company medical department, under the leadership of a Senior Vice President (a medical doctor) at PCL headquarters in California.

84.    In the case of PCL and its sister companies (Holland America and Carnival), one of the key people responsible for leading and coordinating the COVID-19 pandemic response fleetwide, including the outbreaks on the *DIAMOND PRINCESS*, *GRAND PRINCESS*, *RUBY PRINCESS* and *CORAL PRINCESS*, was Grant Tarling, M.D., M.P.H. (hereinafter "Dr. Tarling").

85.    At all times relevant, Dr. Tarling was Group Senior Vice President, and Chief Medical Officer for PCL and Carnival (PCL's parent company).

86.    In 2011, Dr. Tarling, then incoming Chairman of ACEP's Cruise Ship Medicine Section announced:

> Cruise ship new-builds have continued to innovate over the last 15 years and the major cruise lines have designed modern medical facilities comprising several ICUs, computerized radiology, and sophisticated laboratories. As a consequence, medical staffing experience and quality has also improved. Some cruise lines' medical departments have achieved accreditation to international health care standards and ISO 9001 certification.

87.    In announcing PCL's receipt of ISO 9001 certification for its medical facilities, Dr. Tarling reportedly went on to observe, "I think many people would be surprised and reassured to know that our medical centers achieve similar quality standards to medical facilities ashore."

88.    In 2013, Dr. Tarling co-authored an article that acknowledged that cruise ships "represent a potential source for introduction of novel or antigenically drifted influenza virus strains to the United States" and that cruise ship characteristics, such as "close quarters and prolonged contact among travelers on ships and during land-

based tours before embarkation, increase the risk of communicable disease transmission."[38]

89.    A study published on February 28, 2020, echoed Dr. Tarling's findings, and highlights the unique conditions of cruise ships that "amplified" the spread of COVID-19 among those onboard the *DIAMOND PRINCESS*.[39] The study also revealed that extended periods of time on the ship without quarantine increased the spread of the virus.

**The Outbreak on the *DIAMOND PRINCESS***

**January 20, 2020 – February 5, 2020**

90.    On or about December 31, 2019, Chinese health officials reported a cluster of cases of acute respiratory illness associated with the Hunan seafood and animal market in the City of Wuhan, Hubei Province, in central China.[40]

91.    On or about January 8, 2020, Chinese health officials confirmed that a coronavirus (Covid-19) was associated with this initial cluster.[41]

92.    On or about January 20, 2020, the *DIAMOND PRINCESS* cruise ship departed Yokohama, Japan, carrying approximately 3,700 passengers and crew.

93.    On or about January 24, 2020, the United States Coast Guard issued its first Marine Safety Information Bulletin (MSIB) – Novel Coronavirus Precautions. The warnings included:

> A novel (new) coronavirus (2019-nCoV) is causing an outbreak of pneumonia-type illness in the City of Wuhan, Hubei Province, China.

---

[38] Kimberly B. Rogers, MPH, Shahrokh Roohi, MPH, Timothy M. Uyeki, MD, *et al.*, *Laboratory-based respiratory virus surveillance pilot project on select cruise ships in Alaska, 2013-2015*, Journal of Travel Medicine 2017, 1-6, at 2 (2017).

[39] J. Rocklov and H. Sjodin, *COVID-19 outbreak on the Diamond Princess cruise ship: estimating the epidemic potential and effectiveness of public health countermeasures*, Journal of Travel Medicine, Published February 28, 2020, https://academic.oup.com/jtm/article/27/3/taaa030/5766334 (last visited August 12, 2020).

[40] Anita Patel; Daniel B. Jernigan, *Initial Public Health Response and Interim Clinical Guidance for the 2019 Novel Coronavirus Outbreak – United States*, December 31, 2019 – February 4, 2020, CDC. (https://www.cdc.gov/mmwr/volumes/69/wr/mm6905e1.htm)

[41] *Id.*

This outbreak began in early December 2019 and continues to expand in scope and magnitude. Global surveillance is in the early stages and confirmation of more cases in China and beyond its borders is expected. There have been cases discovered across the globe, including 2 cases in the United States. These cases have been directly associated with travelers who had visited the affected region in China. Coronaviruses are a large family of viruses. There are several known coronaviruses that infect people, usually causing only mild respiratory symptoms similar to the common cold. However, this novel coronavirus appears capable of causing illness that is more serious. Signs and symptoms include fever, cough, and difficulty breathing.

…

Preliminary information suggests that older adults, and people with underlying health conditions, may be at increased risk for severe disease from this virus.

…

Vessel masters shall inform Coast Guard boarding teams of any ill crewmembers on board their vessel prior to the Coast Guard embarking and Boarding Teams should verify vessel illnesses with CDC if concerns arise. Local industry stakeholders, in partnership with their Coast Guard Captain of the Port, should review and be familiar with section 5310 Procedures for Vessel Quarantine and Isolation, and Section 5320 - Procedures for Security Segregation of Vessels in their Area Maritime Security Plan.

94.     On or about January 25, 2020, a symptomatic passenger departed the *DIAMOND PRINCESS* in Hong Kong, where he was evaluated. Testing confirmed SARS-COV-2 (COVID-19) infection.[42]

95.     On or about January 30, 2020, the director-general of the WHO declared the outbreak of a novel coronavirus disease (COVID-19) a public health emergency of international concern.

96.     On or about January 31, 2020, the President of the United States suspended, and limited entry of all foreign nationals present in China during the 14 days preceding entry into the United States (effective February 2, 2020).

---

[42]  Patel; Jernigan, *Initial Public Health Response and Interim Clinical Guidance for the 2019 Novel Coronavirus Outbreak – United States*, supra.

97.     On or about January 31, 2020, the United States Department of Transportation issued Maritime Communication with Industry (MSCI) Advisory. The Advisory, issued to all maritime commercial operators, including PCL, provided in part:

> A health threat potentially affecting mariners and maritime commerce has been identified which was first detected in Wuhan, China. The nature of the event is an outbreak of respiratory illness caused by a novel coronavirus ("2019-nCoV") and is being monitored by the U.S. Centers for Disease Control (CDC), https://www.cdc.gov/coronavirus/2019-ncov/index.html. Coronaviruses range in severity from the common cold to Severe Acute Respiratory Syndrome (SARS) and Middle East Respiratory Syndrome (MERS). The CDC has issued a Level 3 Travel Health Warning to avoid nonessential travel to Wuhan, China and a Level 1 Travel Health Watch to practice usual precautions elsewhere in China … Globally, ports are taking actions including health screenings of seafarers for 2019-nCoV and restricting access to Wuhan port in China. Further updates will be provided when available. This alert will automatically expire on January 31, 2020.

98.     On or about February 1, 2020, a PCL employee and/or agent in Hong Kong sent an e-mail to PCL headquarters in California, warning top executives that an 80-year-old passenger had tested positive on the *DIAMOND PRINCESS*, after getting off in Hong Kong. The e-mail relayed a warning from the Hong Kong authorities and asked PCL to "do the necessary disinfection."[43]

99.     Nothing happened. In an interview with the New York Times, Princess reportedly stated it believed the alert sat unread in unmonitored inboxes. Dr. Grant Tarling, PCL's Chief Medical Officer and its top executive tasked with leading efforts to contain viral outbreaks on the fleet, reportedly said "he hadn't learned about the

---

[43] Matt Apuzzo, Motoko Rich, *Failures on the Diamond Princess Shadow Another Cruise Ship Outbreak*, The New York Times, March 8, 2020. (https://www.nytimes.com/2020/03/08/world/asia/coronavirus-cruise-ship.html)

Plaintiff's Complaint and Demand for Jury Trial

infection on the *DIAMOND PRINCESS* until the following day (evening of February 2) – after being alerted to a post on social media."[44]

100.   At all relevant times, Dr. Tarling oversaw from his office in California (PCL's headquarters) the company's response to the COVID-19 outbreak on the fleet.[45]

101.   In an interview with the New York Times, PCL officials offered contradictory and changing accounts about their response. Company e-mails reportedly show Dr. Tarling knew about the Hong Kong passenger's infection the morning of February 2. Instead of ordering protocols to immediately isolate passengers, Dr. Tarling's only action was to reportedly e-mail a Hong Kong doctor, listing the patient's name, his hospital wing, his traveling companions and the date of diagnosis. The subject line of the e-mail reportedly began: "Confirmed Coronavirus Case." [46]

102.   On or about February 2, 2020, Dr. Albert Lam, an epidemiologist for the Hong Kong government, wrote to PCL to recommended immediate action: "We advise thorough environmental cleansing and disinfection of the cruise."[47]

103.   Upon information and belief, after this first infection was confirmed, company officials incorrectly assumed that the immediate risk was minimal because the sick passenger had disembarked.

104.   On or about February 3, 2020, activities on *DIAMOND PRINCESS* continued uninterrupted.

105.   On or about February 3, 2020, European Union's Health Gateways Joint Action issued "Advice for ship operators for preparedness and response to outbreak of 2019-nCov acute respiratory disease"[48] with specific recommendations, including:

---

[44]*Id.*
[45]*Id.*
[46]*Id.*
[47]*Id.*
[48]https://www.gac.com/491364/siteassets/about-gac/coronavirus/eu-interim-advice_2019-

Plaintiff's Complaint and Demand for Jury Trial

a. Before boarding, providing information to passengers and crew who are coming from affected areas, or to all passengers and crew before embarking (e.g. verbal communications, leaflets, electronic posters etc.). The information should include: symptoms of Acute Respiratory Illness (ARI) including fever and sudden onset of respiratory infection with one or more of the following symptoms: shortness of breath, cough or sore throat; hygiene rules (hand washing, coughing and sneezing etiquette, disposal of dirty tissues, social distancing, elimination of handshaking events etc.); special considerations for high-risk groups; what to do in case of relevant symptoms; and the potential for an outbreak on board;

b. Crew arriving on board from affected areas should be informed about the symptoms of ARI. Further, they should be monitored daily by a health care staff on board for 14 days after leaving the affected area for any symptoms of ARI, and be asked to immediately report any relevant symptoms to the ship doctor and supervisor;

c. Cruise lines should provide guidance to crew regarding the recognition of the signs and symptoms of ARI including fever and sudden onset of respiratory infection with one or more of the following symptoms: shortness of breath, cough or sore throat;

d. Crew should also be reminded about the procedures to be followed during an outbreak of other respiratory illnesses, such as using the Influenza Like Illness outbreak management plan, which should be available on board the ship;

e. Adequate medical supplies and equipment should be available on board to respond to an outbreak as described in the World Health Organization (2007) recommended medicines and equipment by the International Medical Guide for Ships 3rd edition;

---

ncov_maritime_4_2_2020_f.pdf

f.  Adequate supplies of sample medium and packaging, disinfectants and hand hygiene supplies should also be carried on board;

g.  Adequate supplies of PPE should be carried on board including gloves, impermeable gowns, goggles, surgical masks and FFP2/ FFP3 masks;

h.  Cabins and quarters occupied by patients and contacts of 2019-nCoV acute respiratory disease should be cleaned and disinfected according to cleaning and disinfection protocols of infected cabins (as per protocols for Norovirus gastroenteritis outbreak level). Thorough cleaning of environmental surfaces with water and detergent and application of common disinfectants (such as sodium hypochlorite) used during outbreak procedures for Norovirus should be applied;

i.  Laundry, food service utensils and waste from cabins of suspect cases and contacts should be handled as infectious, in accordance with the outbreak management plan provided on board for other infectious diseases (Norovirus gastroenteritis).

106.  On or about February 3, 2020, PCL stepped-up cleaning on the *DIAMOND PRINCESS*, but it initiated only the lowest-level protocols for outbreaks. "There's no point in going and start cleaning the ship when we really didn't know what, if any, risk there was onboard," PCL's Dr. Tarling reportedly said in an interview with the New York Times. [49]

107.  On or about February 3, 2020, authorities in Japan ordered the Captain of the ship to remain at Yokohama port upon arrival, with no persons allowed to disembark.

108.  At that time, 2,666 passengers and 1,045 crew members were on board, totaling 3,711 persons.

---

[49] Matt Apuzzo, Motoko Rich, *Failures on the Diamond Princess Shadow Another Cruise Ship Outbreak*, The New York Times, March 8, 2020. (https://www.nytimes.com/2020/03/08/world/asia/coronavirus-cruise-ship.html)

109.   On or about February 3, 2020, health authorities in Japan reviewed logs at the onboard clinic for symptomatic (febrile or respiratory) patients and obtained respiratory specimens from them. On February 5, severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) was detected through real-time reverse transcription PCR (rRT-PCR) in 1 of these specimens.[50]

110.   On or about February 3, 2020, late in the evening, *DIAMOND PRINCESS* passengers heard for the first time a Captain's announcement via intercom, that a passenger who had been on the ship and disembarked in Hong Kong was infected.

111.   Upon information and belief, nearly 48 hours elapsed between the alert to PCL on February 1 and the captain's announcement to the ship on February 3 that a passenger had been infected, giving the virus time to spread.

112.   Upon information and belief, despite having an outbreak spreading out of control, the captain of the *DIAMOND PRINCESS* did not implement a mandatory quarantine on February 3, nor on February 4, 2020.

113.   Upon information and belief, passengers were allowed to continue to roam freely around the ship on February 3 and February 4, 2020, allowing the virus to spread further for an additional 48 hours.

114.   The response aboard the *DIAMOND PRINCESS* did not reflect major concern. The buffets remained open as usual. Onboard celebrations, opera performances and goodbye parties continued on February 2, 3 and 4.

115.   Upon information and belief, PCL failed to provide prompt instructions to passengers and crewmembers to manage the outbreak including encouraging handwashing, failing to promptly eliminate self-service buffets and failing to promptly cancel public events and gatherings.

---

[50] *Epidemiology of Covid-19 Outbreak on Cruise Ship Quarantined at Yokohama, Japan, February 2020*, Centers for Disease Control and Prevention, Volume 26, Number 11 – November 2020.

116. Underpinning PCL's approach was an optimistic but ultimately inaccurate belief that perhaps danger had been averted, because the 80-year-old infected passenger had disembarked in Hong Kong more than a week earlier, along with his daughter and their two travelling companions.

117. In an interview with the New York Times, Dr. Tarling reportedly said: "There's nothing to believe that we have to put face masks on every single guest."[51]

118. Dr. Tarling also did not order the crew to begin what is known as contact-tracing, the task of questioning everybody and identifying who had been in contact with the infected passenger.[52] This decision was contrary to public health guidelines, dictating that the process should begin immediately and that anyone who was in close contact should be isolated.

119. In an interview with the New York Times, Dr. Tarling reportedly said: Japanese health officials planned to do the contact tracing in a matter of hours, when the ship arrived in Yokohama on February 3. Until then, he reportedly considered only the elderly man (who disembarked in Hong Kong) and his traveling party to be close contacts.[53]

120. Dr. Tarling's decision was in contravention to WHO medical guidelines, defining close contacts as "anyone who had face-to-face contact with the patients," including but not limited to: dining and activity partners, dining servers (who are typically assigned to the same couple on certain restaurants throughout the cruise), housekeepers responsible for cleaning the cabins, and passengers sharing tour buses.[54]

---

[51] Matt Apuzzo, Motoko Rich, *Failures on the Diamond Princess Shadow Another Cruise Ship Outbreak*, The New York Times, March 8, 2020. (https://www.nytimes.com/2020/03/08/world/asia/coronavirus-cruise-ship.html)
[52] *Id.*
[53] *Id.*
[54] World Health Organization. Global Surveillance for human infection with novel coronavirus (2019-nCoV). Interim guidance v3 2020. See also European Union's Health Gateways Joint Action issued "Advice for ship operators for preparedness and response to outbreak of 2019-nCov acute respiratory disease" (https://www.gac.com/491364/siteassets/about-gac/coronavirus/eu-interim-advice_2019-ncov_maritime_4_2_2020_f.pdf)

121.   In questions submitted through Princess in response to inquiries by the New York Times, Gennaro Arma, the ship's captain, reportedly said the ship's response on February 3 and 4, was limited to providing "increased number of hand sanitizers, rotated buffet utensils more frequently and stepped-up cleaning."[55]

122.   Upon information and belief, between February 1 and February 4, 2020, PCL shoreside managers and *DIAMOND PRINCESS* shipboard officers knew that the virus was rapidly spreading and withheld that information from passengers.

123.   At all relevant times, despite warnings from Hong Kong and Japanese health officials, the captain and crewmembers limited the flow of information to passengers, effectively downplaying the risks of the outbreak.

124.   Passengers aboard the *DIAMOND PRINCESS*, noticed few ship-wide changes on February 3 and 4, after the announcement

### The Quarantine on the *DIAMOND PRINCESS*

### February 5, 2020 – February 18, 2020

125.   At 7.00 am on February 5, 2020, all passengers on the *DIAMOND PRINCESS* were ordered to remain in their cabins (with their respective cabin mates) for 14 days and were informed that this period could be extended if they had close contact with someone who had a confirmed case.

126.   PCL's system to quarantine and isolate passengers was flawed and set up for failure from the start.

127.   PCL delegated the responsibility for quarantining nearly 2,700 passengers to about 1,000 low-paid ship workers who were giving inadequate safety gear, training and guidance.

128.   Because passengers had to remain in their cabins, PCL implemented a system in which crewmembers from all vessel departments were allowed to roam and congregate freely on the ship crew areas (crowded dormitories and galleys) and in

---

[55] Matt Apuzzo, Motoko Rich, *Failures on the Diamond Princess Shadow Another Cruise Ship Outbreak*, The New York Times, March 8, 2020. (https://www.nytimes.com/2020/03/08/world/asia/coronavirus-cruise-ship.html)

passenger cabin hallways, in order to deliver passengers meals and entertainment kits throughout the day.

129.   In doing so, PCL turned its own crewmembers into a highly efficient viral transmission system.

130.   Passengers, including Plaintiffs, had to open the door and interact with crewmembers face-to-face throughout the quarantine period. Crewmembers knocked on passenger doors several times per day: to deliver breakfast, newspapers, refreshments, games, lunch and dinner – to approximately 1,500 staterooms.

131.   Upon information and belief, there was insufficient personal protective equipment on board for crewmembers. As such, crewmembers often wore the same pair of gloves to deliver food to dozens of cabins at a time, engaging in door-to-door and face-to-face contact with passengers, a potential source of infection.

132.   Crewmembers also collected dirty dishes and used linens without full protective gear.

133.   Throughout the quarantine period, passengers also noticed crewmembers directly touching and manipulating the food they were delivering to passengers. For example, instead of giving passengers sealed cans/boxes of orange juice and coffee, crewmembers walked cabin to cabin with exposed trays of juice and coffee on plastic cups.

134.   Early in the quarantine crewmembers also distributed food on china/re-usable tableware.

135.   On or about February 17, 2020, in an interview with U.S.A. Today, Dr. Antony Fauci, Director of the U.S. National Institute of Allergy and Infectious Diseases (NIAID) said regarding the *DIAMOND PRINCESS* outbreak and quarantine: "As it turned out, that was very ineffective in preventing spread on the ship … The quarantine process failed. I'd like to sugarcoat it and try to be diplomatic about it, but it failed. People were getting infected on that ship. Something went awry in the

process of the quarantining on that ship. I don't know what it was, but a lot of people got infected on that ship."[56]

136.    On or about February 18, 2020, a Japanese infectious disease specialist, Dr. Kentaro Iwata of Kobe University, boarded the *DIAMOND PRINCESS* in Yokohama. Dr. Iwata described the conditions on board the ship as "violating all infection control principles" and "completely chaotic."

137.    Dr. Iwata released a 12-minute video of his findings, just hours before the official end to a quarantine that kept 3,700 passengers and crew confined on the ship for 13-14 days. In the video, Dr. Iwata painted a disturbing picture of conditions on the *DIAMOND PRINCESS*. "The cruise ship was completely inadequate in terms of infection control," he said. There was no distinction between infection-free "green zones" and potentially contaminated "red zones." People were coming and going between the zones with and without personal protection equipment, eating lunch and handling smartphones with their protective gloves on. The lack of zone separation extended to the ship's medical center and even to the medical officer. "She was saying she was already infected; so she was giving up protecting herself."

138.    A CDC report,[57] made the following factual findings regarding the outbreak on the *DIAMOND PRINCESS*: Among the 3,711 DIAMOND PRINCESS passengers and crew, 712 (19.2%) had positive test results for SARS-Cov-2 (Covid-19); 331 were asymptomatic at the time of testing; Among the 381 symptomatic patients, 37 required intensive care, and 9 died; Weeks later, on March 13, among 428 U.S. passengers and crew, 107 (25%) had positive test results for COVID-19, 11 U.S. passengers remained hospitalized in Japan (median age = 75 years), including 7 in serious condition (median age = 76 years); On the DIAMOND PRINCESS transmission largely occurred among passengers before quarantine was implemented,

---

[56] *Why did US break Diamond Princess quarantine 'Something Went awry*,' USA Today, Feb. 17, 2020    (https://www.usatoday.com/story/travel/cruises/2020/02/17/coronavirus-official-explains-diamond-princess-cruise-quarantine-fail/4785290002/)
[57] *Public Health Responses to COVID-19 Outbreaks on Cruise Ships — Worldwide, February–March 2020*, CDC (https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm)

whereas crew infections peaked after quarantine; SARS-CoV-2 RNA was identified on a variety of surfaces in cabins of both symptomatic and asymptomatic infected passengers up to 17 days after cabins were vacated on the Diamond Princess but before disinfection procedures had been conducted.

139.   Ultimately, the 10 cases of COVID-19 originally diagnosed on the *DIAMOND PRINCESS*, rapidly escalated to over 700 cases—over one-fifth of the passengers and crew members onboard the ship at the time. Investigative reporting about the *DIAMOND PRINCESS* revealed that well after PCL (and its parent company CARNIVAL) became aware of the first case aboard the ship, Defendants worked to "keep the fun going" by "encouraging [guests] to mingle."[58]

140.   PCL's lax attitude to protect its passengers and crew members soon led to outbreaks on ships in its fleet worldwide.

141.   In the midst of the quarantine on the *DIAMOND PRINCESS*, beginning on February 11, 2020, another ship in the PCL fleet, the *GRAND PRICESS*, suffered its own outbreak.

142.   As the virus was spreading on the *GRAND PRINCESS*, Dr. Tarling who was also tasked to manage that outbreak, was asked by the New York Times whether he wished he had done anything differently to contain the outbreak on the *DIAMOND PRINCESS*. Dr. Tarling reportedly could not point to a single decision that he would change.[59]

### February 13, 2020, CDC Guidance for Ships on Managing Suspected Coronavirus Disease

143.   On or about February 13, 2020, the CDC issued its Guidance for Ships on Managing Suspected Coronavirus Disease 2019 (hereinafter "February 13, 2020

[58] Austin Carr and Chris Palmieri, *Socially Distance This: Carnival Executives Knew They Had a Virus Problem, But Kept the Party Going*, Bloomberg, April 16, 2020, https://www.bloomberg.com/features/2020-carnival-cruise-coronavirus/
[59] Matt Apuzzo, Motoko Rich, *Failures on the Diamond Princess Shadow Another Cruise Ship Outbreak*, The New York Times, March 8, 2020. (https://www.nytimes.com/2020/03/08/world/asia/coronavirus-cruise-ship.html)

CDC COVID-19 Ship Guidance").[60] The CDC COVID-19 Guidance gave express directives to mitigate the spread Covid-19 on board cruise ships, including directives on personal protective measures, management of sick or exposed persons on board, reporting of suspected or confirmed cases, and cleaning and disinfection recommendations for common areas on the ship and areas previously occupied by individuals with suspected or confirmed COVID-19.

144. The February 13, 2020, the CDC COVID-19 Ship Guidance reiterated similar recommendations issued by the CDC to cruise lines four years earlier, in the above mentioned "August, 2016, Guidance For Cruise Ships On Influenza-like Illness (ILI) Management, Quarantine and Isolation."

145. The February 13, 2020, CDC COVID-19 Ship Guidance directed that ship companies should develop, implement, and operationalize an appropriate, actionable, and robust plan to prevent, mitigate, and respond to the spread of COVID-19 on board ships.

146. The February 13, 2020, CDC COVID-19 Ship Guidance also directed that cruise ship mitigation and response plans should include:

a. Training of all crew on COVID-19 prevention and mitigation;

b. Onboard monitoring of crew and non-crew for signs and symptoms of COVID-19;

c. Onboard isolation, quarantine, and social distancing;

d. Adequate medical staffing (this can include telehealth or telemedicine providers);

e. COVID-19 outbreak management and response information;

f. Medical arrangements for onshore evaluation and hospitalization;

g. Screening of embarking or disembarking crew and non-crew.

147. The February 13, 2020, CDC COVID-19 Ship Guidance required ship operators to carry a sufficient quantity of:

---

[60] https://www.cdc.gov/quarantine/maritime/recommendations-for-ships.html

a. Personal Protective Equipment (PPE), including facemasks, N95 filtering facepiece respirators or higher, eye protection such as googles or disposable face shields, and disposable medical gloves and gowns;

b. Cloth face coverings to meet day-to-day needs;

c. Medical supplies to meet day-to-day needs;

d. Have contingency plans for rapid resupply during outbreaks;

e. Maintain adequate onboard supplies of antipyretics (fever-reducing medications such as acetaminophen, paracetamol, or ibuprofen), routine antiviral and antimicrobial medications, and supplemental oxygen.

148.   The February 13, 2020, CDC COVID-19 Ship Guidance provided "Pre-Boarding Procedures for Ships," recommending that before boarding, cruise operators should:

a. Conduct verbal or written screening in appropriate languages and in a private environment to determine whether persons have had signs or symptoms of COVID-19 or a known exposure to a person with COVID-19 within the past 14 days;

b. Use temperature checks to identify any person with a temperature of 100.4°F or greater;

c. Deny boarding of a crew member or non-crew member who is suspected of having COVID-19 because they have symptoms, a temperature of 100.4°F or greater, or have had known exposure to a person with COVID 19 within the previous 14 days;

d. Require quarantine of crew for 14 days immediately before or upon boarding the ship to prevent introduction of the virus on board.

149.   The February 13, 2020, CDC COVID-19 Ship Guidance also provided "Preventative Measures for Ship Operators" to reduce spread of respiratory infections including COVID-19:

a.  Educate all persons on board about the signs and symptoms of COVID-19;

b.  Assign crew to single-occupancy cabins with private bathrooms, if possible;

c.  Implement social distancing of persons when working or moving through the ship (maintaining at least 6 feet [2 meters] from others);

d.  Instruct persons to wear a facemask or cloth face covering when outside of individual cabins (unless work duties prevent their safe use or necessitate personal protective equipment for hazardous reasons);

e.  Modify meal service to facilitate social distancing (e.g., reconfigure dining room seating, stagger mealtimes, encourage in-cabin dining);

f.  Eliminate self-serve dining options at all meals;

g.  Minimize shore leave; if shore leave occurs, preventive measures are recommended;

h.  Discourage handshaking and instead encourage the use of non-contact methods of greeting;

i.  Promote hand hygiene and cough etiquette;

j.  Place hand sanitizer (containing greater than 60% ethanol or 70% isopropanol) in multiple locations and in sufficient quantities to encourage hand hygiene;

k.  Ensure handwashing facilities are well-stocked with soap, paper towels, and a waste receptacle, or air dryer;

l.  Educate workers that use of cigarettes, e-cigarettes, pipes, or smokeless tobacco can lead to increased contact between potentially contaminated hands and their mouths, and that avoiding these products may reduce their risk of infection.

Plaintiff's Complaint and Demand for Jury Trial

150.   The February 13, 2020, CDC COVID-19 Ship Guidance included instructions for "Isolation of Sick Persons or Confirmed Cases and Quarantine of Close Contacts." These included:

a.   Persons with symptoms of COVID-19 should be isolated using the same guidelines as a person with confirmed COVID-19 until COVID-19 testing can be conducted and results are available;

b.   All persons on board should be educated on and aware of the emergency warning signs for COVID-19;

c.   Quarantine of persons without symptoms who are identified as close contacts of sick persons (until COVID-19 test results are available) or confirmed cases is also needed to minimize on board transmission of SARS-CoV-2, the virus that causes COVID-19;

d.   Isolate or quarantine persons in single-occupancy cabins, with private bathrooms, with the door closed, if possible. Persons should wear a facemask or cloth face covering any time they are outside of isolation or quarantine;

e.   Designated ship medical personnel or other personnel should wear proper personal protective equipment (PPE) when in proximity to isolated or quarantined persons. Breaches in PPE or any potential exposures should be reported to the appropriate medical designee;

f.   Meals should be packaged in disposable dining ware with single-use cutlery and delivered to individual cabins with no face-to-face interaction during this service;

g.   Cabins housing isolated or quarantined persons should not be cleaned by other persons;

h.   Food waste and other garbage should be collected and bagged by the isolated or quarantined person and placed outside the cabin during

designated times for transport to the garbage/recycle room for incineration or offloading;

i.  Soiled linens and towels should be handled by the isolated or quarantined person and placed outside the cabin in labeled bags during designated times for transport to the laundry room.

151.  The February 13, 2020, CDC COVID-19 Ship Guidance included instructions for monitoring "persons with known or suspected COVID-19," including checking temperatures of close contacts "twice daily," and to "immediately isolate in cabins if they experience signs or symptoms."

152.  In a February 18, 2020, update issued in response to the crisis aboard the *DIAMOND PRINCESS*, the CDC stated that "the rate of new reports of positives [now] on board, especially among those without symptoms, highlights the high burden of infection on the ship and potential for ongoing risk."[61]

153.  Following the catastrophic outbreak on the *DIAMOND PRINCESS* from January 20 through February 18, Defendants failed to properly follow the February 13, 2020, CDC COVID-19 Ship Guidance, the World Health Organization's "Global Surveillance for human infection with novel coronavirus, (2019-nCoV), Interim guidance v3 2020," and the European Union's Health Gateways Joint Action issued "Advice for ship operators for preparedness and response to outbreak of 2019-nCov acute respiratory disease."

154.  Following the catastrophic outbreak on the *DIAMOND PRINCESS* from January 20 through February 18, PCL failed to properly and promptly implement a cruise ship mitigation and response plan (as outlined in the February 13, 2020, CDC COVID-19 Ship Guidance) in the rest of its fleet, including the *GRAND PRINCESS*.

---

[61] *See* Centers for Disease Control and Prevention, Update on the Diamond Princess Cruise Ship in Japan, Feb. 18, 2020, https://www.cdc.gov/media/releases/2020/s0218-update-diamond-princess.html

155.   Unable and/or unwilling to implement the February 13, 2020, CDC COVID-19 Ship Guidance in the rest of its fleet, PCL also refused to terminate/cancel the rest of its itineraries and fleet operations worldwide.

156.   Instead, PCL continued business as usual in the rest of its fleet world-wide. Following the outbreak on the *DIAMOND PRINCESS*, activities on the rest of PCL's cruises continued uninterrupted: mass gatherings in onboard casinos, theaters, buffet lines, dining areas, nightclubs, bars, restaurants, and housekeeping visits.

### Outbreak on the *GRAND PRINCESS*
### Mexican Riviera Cruise
### February 11, 2020 – February 21, 2020

157.   Despite its awareness of the unique risks created by the cruise ship environment, warnings from the World Health Organization, the European Union and the CDC, and its experience with COVID-19 outbreak on the *DIAMOND PRINCESS*, on February 11, 2020, PCL operated a roundtrip voyage from San Francisco to Mexico aboard the *GRAND PRINCESS*.

158.   On or around February 19, 2020, PCL became aware of at least one passenger suffering from COVID-19 symptoms aboard the *GRAND PRINCESS*.

159.   According to PCL's Chief Medical Officer, Dr. Tarling, PCL believed the infected passenger was already carrying the virus when he boarded the *M/V GRAND PRINCESS* on February 11, 2020.[62] Despite its knowledge regarding COVID-19, PCL had no effective passenger medical screening methods in place at the time of boarding.

160.   Dr. Tarling reported that the infected passenger sought medical treatment from the medical center onboard the *GRAND PRINCESS* on or about February 20, 2020. The passenger reported suffering from "acute respiratory distress" for about a

---

[62]   Thomas Fuller, John Eligon, and Jenny Gross, *Cruise Ship, Floating Symbol of America's Fear of Coronavirus, Docks in Oakland*, The New York Times, March 9, 2020, https://www.nytimes.com/2020/03/09/us/coronavirus-cruise-ship-oakland-grand-princess.html (last visited April 7, 2020).

week before seeking treatment. Upon information and belief, this information would have triggered mandatory reporting under 42 C.F.R. 71.1, et seq. and constitutes a "hazardous condition" per 33 C.F.R. § 160.216. [63]

161.   Upon its return to San Francisco, on February 21, 2020, a passenger originally from Placer County, California (hereinafter "Placer County Passenger") who had been on the *GRAND PRINCESS* during the Mexican Riviera cruise, disembarked. 6 days later, on February 27, 2020, this passenger was hospitalized, tested positive for COVID-19 and, on March 4, 2020, became California's first reported death from the virus.

162.   Another passenger, originally from Marin County, California (hereinafter "Marin County Passenger"), also exposed to COVID-19 during the Mexican Riviera Cruise, disembarked on February 21, 2020, was reported on March 9, 2020, as Marin County's first COVID-19 positive case, and on March 27, 2020, became Marine County's first COVID-19 death.

163.   Another passenger, originally from Sonoma County, California, (hereinafter "Sonoma County Passenger"), also exposed to COVID-19 during the Mexican Riviera Cruise, disembarked on February 21, 2020, and on March 4, 2020, was reported as the first COVID-19 positive case in Sonoma County.

164.   Upon information and belief, at least three other passengers on the GRAND PRINCESS's Mexican Riviera Cruise suffered from COVID-19 symptoms while on the vessel, likely exposing dozens of other passengers to the virus.

///

---

[63]   Section 160.216 requires that "[w]henever there is a hazardous condition … on board a vessel or caused by a vessel or its operation, the owner, agent, master, operator, or person in charge must immediately notify the nearest Coast Guard Sector Office . . . ."  A "[h]azardous condition means any condition that may adversely affect the safety of any vessel … or the environmental quality of any port, harbor, or navigable waterway of the United States. It may, but need not, involve … injury *or illness of a person aboard* … ." 33 CFR § 160.202 (emphasis added).

**Outbreak on the *GRAND PRINCESS***

**Hawaii Cruise**

**February 21, 2020 – March 5, 2020**

165.   On February 21, 2020, after the turnaround process was completed, the *GRAND PRINCESS* departed for a second, fifteen (15) night Hawaii Cruise, with nearly 2,500 people on board, including Plaintiff IRIS HOUSE and decedent MICHAEL HOUSE.

166.   During the course of their cruise, Plaintiff IRIS HOUSE and decedent MICHAEL HOUSE encountered deplorable unsanitary conditions on the *GRAND PRINCESS,* in clear violation of the CDC's Vessel Sanitation Program Guidelines. This also indicates an unwillingness to step up sanitation on the *GRAND PRINCESS* in the aftermath of the viral outbreak on the *DIAMOND PRINCESS*.  These unsanitary conditions included:

      a.  Jacuzzi and indoor pool area heaters that did not operate properly – with crewmembers reaffirming they were "broken" and "nothing could be done about it;"

      b.  A filthy cabin, with stains on the couch and rotten food in the refrigerator left from past passengers;

      c.   Deck 5 dining areas flooded with foul smelling water;

      d.  Soiled bathrooms on Deck 14;

      e.  Leaks of soiled and foul-smelling water emanating from the roof and falling over patrons' drinks on the onboard 'Vines Bar;'

      f.  Poorly cooked meals;

      g.  Unsafe drinking water.[64]

---

[64]  Charles Bethea, The Diary of a Grand Princess Crew Member As the Coronavirus Spread on the Ship, The New Yorker, March 17, 2020.  https://www.newyorker.com/news/news-desk/the-diary-of-a-grand-princess-crew-member-as-covid-19-spread-on-the-ship

167.   68 passengers, and over 1,000 crew members remained onboard the *GRAND PRINCESS* from the prior Mexican Riviera Cruise, to continue traveling on the ship's next voyage.

168.   Upon information and belief, many of the 68 passengers (and many of the 1,000 + crew) who remained from the prior itinerary, contracted COVID-19 during the Mexican Riviera Cruise. These remaining passengers and crew ultimately exposed new passengers embarking on the Hawaii Cruise, including Plaintiff IRIS HOUSE and decedent MICHAEL HOUSE.

169.   Defendants did not initiate effective measures to sanitize or disinfect the vessel in-between voyages, and did not implement any procedures for screening or testing existing or new passengers boarding the ship for the Hawaii-bound voyage.

170.   Defendants did not notify passengers who were scheduled to board the vessel on February 21, 2020, that passengers from the prior Mexico trip had reported COVID-19 symptoms, or of the fact that passengers remaining on board the *GRAND PRINCESS* had been exposed to and might be infected with and/or carrying the virus. With the known likely presence of the virus in passengers and crew members who remained on the ship, the ship never should have sailed on to Hawaii.

171.   Although PCL had assured passengers that the trip would be safe and that PCL would take measures, such as requiring temperature checks for those boarding the ship, in order prevent the presence of COVID-19 on the *GRAND PRINCESS*, PCL instituted no such effective measures. Plaintiffs and other passengers were not asked to check their temperatures and were not subject to any medical screening upon boarding the ship other than a questionnaire that asked them if they had felt ill or recently traveled to China.

172.   Upon information and belief, on or about February 25, 2020, while Plaintiff IRIS HOUSE and decedent MICHAEL HOUSE were in the midst of the Hawaii trip aboard the *GRAND PRINCESS*, PCL sent emails to passengers who disembarked from the San Francisco-to-Mexico trip on February 21, 2020. The email

alerted the earlier passengers about their potential exposure to COVID-19 during their time on the cruise. No such notice was effectively provided to passengers who were onboard the ship on February 25, 2020, including Plaintiff IRIS HOUSE and Decedent MICHAEL HOUSE.

173.   Between February 26, 2020 and February 29, 2020, the *GRAND PRINCESS* exclusively navigated and berthed within the 3-mile territorial waters of the State of Hawaii, making scheduled stops in the ports of call of Kauai (February 26), Honolulu/Oahu (February 27), Mauri (February 28), and Hilo (February 29).

174.   On or about March 3 and 4, 2020, decedent MICHAEL HOUSE began to experience the following physical symptoms of COVID-19: a prolonged, dry, and persistent cough accompanied with shortness of breath. Days later, as the cough and shortness of breath worsened, decedent MICHAEL HOUSE experienced high fevers, and tiredness. Decedent MICHAEL HOUSE tested positive for COVID-19, was diagnosed with pneumonia, and died on March 29, 2020. The official cause of death was COVID-19.

175.   Based on clinical studies, the median incubation period for COVID-19 is 5.1 days (in 95% of infections).   Accordingly, because decedent MICHAEL HOUSE developed symptoms on or about March 3, 2020 and March 4, 2020, he was exposed to – and contracted - COVID-19, during the time that the *GRAND PRINCESS* was within the 3-mile territorial waters of the State of Hawaii, between February 26, 2020 and February 29, 2020

176.   Upon information and belief, increased sanitary precautions did not begin onboard the *GRAND PRINCESS* until on or about March 4, 2020, allowing the virus to spread freely between February 21, 2020 through March 4, 2020.

177.   PCL did not inform the passengers on board the *GRAND PRINCESS* of COVID-19 cases in passengers who traveled on the ship's Mexico trip until March 4, 2020, when, early in the morning, passengers received a health advisory. The advisory explained that the ship would no longer be traveling to Ensenada, Mexico, as

originally scheduled. It would instead return directly to San Francisco. Further, the advisory alerted passengers to the investigation of a "small cluster of COVID-19 cases in Northern California connected to" the *GRAND PRINCESS*'s Mexico trip, and informed passengers of their potential exposure to the virus.

178.   Additionally, the advisory asserted that COVID-19 causes "mild illness in about 80% of cases," and that only "[a]bout 20% of people develop more severe symptoms."

179.   The March 4, 2020, health advisory suggested that passengers traveling on the Hawaii trip had already reported suffering from COVID-19 symptoms, and instructed other passengers who were experiencing or had at any time during the trip experienced symptoms "of acute respiratory illness with fever chills or cough" to immediately contact the ship's Medical Center. Finally, the advisory recommended that passengers wash their hands, use hand sanitizer, avoid contact with those suffering from respiratory illness, cover their noses and mouths when coughing and sneezing, and avoid touching their eyes and face. It did not make any recommendations for quarantine or social distancing measures. Nor did it call for passengers to wear masks.

180.   The March 4th health advisory was signed by Grant Tarling, MD, MPH, the Group Senior Vice President and Chief Medical Officer for PCL and other PCL sister cruise lines.

181.   On March 4th, 2020, the *GRAND PRINCESS* crew also received back-to-back notices (issued for crew eyes only).[65] Alarmingly, for the first time, two weeks into the cruise (and weeks after its experience with the outbreak on the *DIAMOND PRINCESS*) the crew was alerted:

   a.  Crew-to-passenger contact would be kept to a minimum;

---

[65] Charles Bethea, The New Yorker, March 17, 2020.  https://www.newyorker.com/news/news-desk/the-diary-of-a-grand-princess-crew-member-as-covid-19-spread-on-the-ship

b.  Food and drink service for passengers would not change, but "crew should remain below deck unless performing their regular duties;"

c.  Sanitation protocols would now be at "maximum level;"

d.  Hand washing was "more important than ever;"

e.  All nonessential duties on the *GRAND PRINCESS* would be cancelled, because some guests who had sailed on the ship's previous cruise had tested positive for the coronavirus, after they had disembarked.

182.  Upon information and belief, individuals who had continued on to Hawaii from the prior leg of the cruise, to and from Mexico, began cabin-based quarantine for the first time on or around March 4, 2020.

183.  Upon information and belief, passengers and crew who had continued on to Hawaii from the prior leg of the cruise, to and from Mexico, were not asked and/or required to quarantine prior to March 4, 2020, allowing the virus to spread freely between February 21, 2020 and March 4, 2020.

184.  Upon information and belief, between February 21, 2020 and March 4, 2020, all passengers and crew (including those from the prior leg of the cruise) were allowed and encouraged to roam freely around the ship, and congregate in crowded restaurants, dining areas, theaters, bars, casinos, gyms, pools spas, and excursion tours, allowing the virus to spread.

185.  Even after the 68 passengers who had continued on to Hawaii from the prior leg of the cruise to and from Mexico began cabin-based quarantine for the first time on or around March 4, 2020, business remained as usual for the rest of the thousands of other passengers, who continued to congregate in crowded restaurants, dining areas, theaters, bars, casinos, gyms, pools spas, allowing the virus to spread.

186.  Spurred by the COVID-19 outbreak on the *GRAND PRINCESS* and the death of the Placer County Passenger who had been on the Mexican Riviera Cruise, Governor Gavin Newsom declared a state of emergency in California on March 4, 2020, to manage the COVID-19 outbreak. As a result, the State of California refused

to allow the vessel into port in San Francisco, forcing the vessel to anchor off the city's coast. Governor Newsom stated at a press conference that there were 11 passengers and 10 crew members on the ship who were experiencing symptoms.

187.   Despite Governor Newsom's declaration, on March 4, 2020, life on the ship remained unchanged for the Hawaii Cruise passengers and crew. PCL continued to host events on the *GRAND PRINCESS* identified in the daily newsletter, the "Princess Patter," including Formal Night and its associated dinner. That afternoon and evening, Plaintiff IRIS HOUSE and Decedent MICHAEL HOUSE:

> a.  Spent most of the day in crowded public areas playing trivia, visiting the casino and shops;
>
> b.  Attended Formal Night with hundreds of other passengers;
>
> c.  Had dinner at a crowded specialty restaurant;
>
> d.  Browsed shops which were still open at 7.00pm.

188.    On March 5, 2020, business continued as usual. That morning Plaintiff IRIS HOUSE and Decedent MICHAEL HOUSE participated in a crowded trivia quiz at the Vista Lounge (an enclosed area with capacity for 457 people). While some shops had begun to close, the ship's crowded bars remained open, allowing the virus to spread.

189.   On March 5, 2020, at lunch time, the Captain announced for the first time that there would be a mandatory quarantine of all passengers in their cabins, beginning at 2.00pm. The Captain and the *GRAND PRICESS* crew then encouraged passengers to stock up on food and drinks to take up to their cabins, leading to chaos and massive crowds in all public and dining areas, allowing the virus to spread.

190.   The announcement also led to chaos, crowds and panic buying in the crew sections of the ship, allowing the virus to spread.[66]

---

[66]   Charles Bethea, The New Yorker, March 17, 2020.  https://www.newyorker.com/news/news-desk/the-diary-of-a-grand-princess-crew-member-as-covid-19-spread-on-the-ship

191.   On March 5, 2020, before lockdown, Plaintiff IRIS HOUSE and Decedent MICHAEL HOUSE went to change their winning chips at the casino. A crewmember told them to "wash their hands" because the casino chips were "not sanitized" and "virus was spreading amongst crew members."

192. Beginning at 2.00pm on March 5, 2020, two weeks after the ship sailed from San Francisco harbor, PCL instituted more operational changes, including cabin/state room quarantine, meal service to the cabins/state rooms by placing trays in the hallway outside cabin doors, and cessation of daily turndown service and all communal activities.

## Quarantine on the *GRAND PRINCESS*
## Hawaii Cruise
## March 5, 2020 – March 10, 2020

193.   Like the quarantine on the *DIAMOND PRINCESS*, PCL's system to quarantine and isolate passengers on the *GRAND PRINCESS* was flawed and set up for failure from the start.

194.   PCL delegated the responsibility for quarantining nearly 2,700 passengers to about 1,000 low-paid ship workers who were giving inadequate safety gear, training and guidance.

195.   Once again, PCL turned its own crewmembers into a highly efficient viral transmission system.

196.   Crewmembers knocked on passenger doors several times per day: to deliver breakfast, newspapers, refreshments, games, lunch and dinner – to approximately 1,500 staterooms.

197.   Upon information and belief, there was insufficient personal protective equipment on board for crewmembers. As such, crewmembers often wore the same pair of gloves to deliver food to dozens of cabins at a time, engaging in door-to-door and face-to-face contact with passengers, a potential source of infection.

198.   Crewmembers also collected dirty dishes and used linens without full protective gear.

199.   Throughout the quarantine period, crewmembers directly touched and manipulated the food they were delivering to passengers. For example, instead of giving passengers sealed cans/boxes of orange juice and coffee, crewmembers walked cabin to cabin with exposed trays of juice and coffee on plastic cups.

200.   On or about March 6, 2020, Vice President Mike Pence spoke to reporters about the outbreak on the *GRAND PRINCESS*. The Vice President announced that twenty-one of the forty-six people who had been tested up to that point, were positive, nineteen of them crew. Vice President Pence also confirmed the reports about infections on the ship's previous cruise to Mexico, in February. "It's important to note that the Grand Princes actually was on its second tour and we know of coronavirus infections from the first tour as well with very, very difficult results," he said.[67]

201.   The onboard medical center was soon overwhelmed with calls and visits, particularly once the captain confirmed that what Pence had said on TV was accurate. Many crewmembers reportedly felt like they were being kept in the dark about possible and potential cases.[68]

202.   While the ship was empty of passengers, crew common areas remained crowded and busy as usual, including the crew smoke room. Even after the passenger quarantine was imposed, many crewmembers were not wearing masks or gloves, engaging in crew-to-crew physical interactions throughout the day, allowing the virus to spread. [69]

203.   While there have been reports of some infected crew members who were being isolated, there did not seem to be enough spare cabins to isolate all of the crew

---

[67] Charles Bethea, The New Yorker, March 17, 2020.   https://www.newyorker.com/news/news-desk/the-diary-of-a-grand-princess-crew-member-as-covid-19-spread-on-the-ship
[68] *Id.*
[69] *Id.*

who were experiencing symptoms – as most crew shared a cabin with another crew member, and a bathroom with two more.[70]

204. Crew members continued to work in different shifts of 24 hours per day to try and keep the passengers "fed and happy."[71]

205. Soon enough, passengers were running out of medication, fresh clothes, and toiletries, feeling trapped and isolated.[72]

206. Throughout the quarantine, Plaintiff IRIS HOUSE called the medical center repeatedly informing the shipboard medical personnel that MICHAEL HOUSE had a persistent and debilitating cough, was visibly ill and was running out of his prescription medication.

207. Desperate, the overworked crew, began a barter system trading laundry detergent for shampoo, and wine/beer for dollars.[73]

208. On or about March 7, 2020, PCL announced through the ship's public address system that they had evacuated a critically ill passenger by ship's tender and a U.S. Coast Guard cutter.

209. On or about March 9, 2020, the ship was allowed to sail into and arrived in the San Francisco Bay escorted by the U.S. Coast Guard. The ship docked in the Port of Oakland and was met by ambulances and medical personnel. 2 CDC employees, in full hazmat gear, knocked on some cabin doors asking passengers if they had any symptoms.

210. When the CDC personnel arrived to Plaintiff IRIS HOUSE and Decedent MICHAEL HOUSE's cabin, IRIS HOUSE informed them that MICHAEL HOUSE had a persistent and debilitating cough since March 3 or 4, 2020, and his symptoms had progressively worsened, including showing drowsiness and exhaustion.

---

[70] *Id.*
[71] *Id.*
[72] *Id.*
[73] *Id.*

211.   On or about March 9, 2020, Passengers from California, and those who were considered most vulnerable to health problems, disembarked. Canadian passengers were also able to leave.

212.   Plaintiff IRIS HOUSE and Decedent MICHAEL HOUSE had to remain on the ship until March 11, 2020. That morning, they were notified that would be allowed to disembark.

213.   Beginning on or about March 11, 2020, Plaintiff IRIS HOUSE experienced the following symptoms: high fever. Later she lost her sense of taste. Subsequent laboratory tests of Plaintiff IRIS HOUSE showed she contracted COVID-19 and developed COVID-19 antibodies.

214.   Based on clinical studies, the median incubation period for COVID-19 is 5.1 days (in 95% of infections).   Accordingly, because Plaintiff IRIS HOUSE developed symptoms beginning on or about March 11, 2020, she contracted COVID-19 during her cruise on the *GRAND PRINCESS*.

### Disembarkation from the *GRAND PRINCESS*
### Hawaii Cruise
### March 11, 2020

215.   PCL's system to disembark passengers from the *GRAND PRINCESS* in Oakland, California was flawed and set up for failure.

216.   On March 11, 2020, from approximately 3.00pm to 3.30pm, Plaintiff IRIS HOUSE and Decedent MICHAEL HOUSE were required to wait on a crowded queue of approximately 100 UK residents on Deck 5, without imposition of social distancing, allowing the virus to spread.

217.   From approximately 3.30pm through 7.00pm (a total of 4 hours), Plaintiff IRIS HOUSE and Decedent MICHAEL HOUSE were required to remain in a crowded (and enclosed) bus on the Oakland port terminal, in close proximity to other PCL passengers, without imposition of social distancing, allowing the virus to spread.

218.   Plaintiff IRIS HOUSE and Decedent MICHAEL HOUSE arrived to Birmingham, UK on March 12, 2020. At that time, were they were instructed to begin a 14-day quarantine.

219.   On March 13, 2020, Decedent MICHAEL HOUSE's condition continued to deteriorate. His physical symptoms included: a persistent and debilitating cough, fever, shortness of breath, inability to speak in full sentences, increased respiratory levels and pulse rate. Paramedics examined him, took his vitals and advised that he be kept at home.

220.   From March 14, 2020 through March 16, 2020, Decedent MICHAEL HOUSE's condition turned for the worst, experiencing chest pains and high fevers (up to 41.1 Celsius / 105.98 Fahrenheit).

221.   On March 17, 2020, Decedent MICHAEL HOUSE was coughing blood and his fever was persistent. Paramedics were called. He was admitted to the hospital that afternoon. Plaintiff IRIS HOUSE was not allowed to join him on the ambulance and in the hospital, due to quarantine restrictions.

222.   On March 17, 2020, during his hospitalization, Decedent MICHAEL HOUSE was diagnosed with pneumonia, and was put on oxygen.

223.   On March 18, 2020, Decedent MICHAEL HOUSE was rushed to the ICU.

224.   On March 19, 2020, Decedent MICHAEL HOUSE tested positive for COVID-19. Doctors also connected him to a ventilator to assist his lungs to breathe.

225.    On March 22, 2020, Plaintiff IRIS HOUSE, still in quarantine and isolated at home, without being able to see her children or be with her husband, spent Mother's Day alone.

226.   On March 27, 2020, Decedent MICHAEL HOUSE's kidneys and other vital organs began to deteriorate.

227.   On March 29, 2020, MICHAEL HOUSE died. The official cause of death was COVID-19.

228.   A report from the CDC about the COVID-19 outbreak about the *GRAND PRINCESS* found that "crew members were likely infected on voyage A [Mexican Riviera Cruise] and then transmitted [the virus] to passengers on voyage B [Hawaii Cruise]" and that the ship "was an example of perpetuation of transmission from crew members across multiple consecutive voyages and the potential introduction of the virus to passengers and crew on other ships." [74]

229.   If Plaintiff IRIS HOUSE and Decedent MICHAEL HOUSE had known that they would be exposed to COVID-19, face the serious and actual risks of contracting or spreading COVID-19, and actually contract and suffer from COVID-19, while onboard the *GRAND PRINCESS*, because, among other things, passengers from the *GRAND PRINCESS*'s San Francisco-to-Mexico trip had suffered from COVID-19 and / or that passengers exposed to COVID-19 on the Mexico trip remained onboard the *GRAND PRINCESS*, Plaintiffs would not have sailed on the February 21, 2020, roundtrip voyage to Hawaii.

## THE CDC'S DEFINITION OF A "PROBABLE CASE

230.   In an April 5, 2020 position statement, the CDC and the Council of State and Territorial Epidemiologists ("CSTE") provided an "interim case definition" for COVID-19 for the purposes of counting and tracking "probable" and "confirmed" COVID-19 cases in the United States. [75]

231.   The interim definition provided three alternative clinical measures for evaluating a patient.

232.   First, a case meets the clinical criteria if there is no alternative more likely diagnosis and at least two of the following symptoms are present:   fever

---

[74] L. Moriarty, et al., Public Health Responses to COVID-19 Outbreaks on Cruise Ships — Worldwide, February–March 2020, 69 Morbidity and Mortality Weekly Report 1, 1 (Mar. 23, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6912e3-H.pdf

[75]   Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19) 2020 Interim Case Definition, Approved April 5, 2020, https://wwwn.cdc.gov/nndss/conditions/coronavirus-disease-2019-covid-19/case-definition/2020/ (last visited August 14, 2020).

(measured or subjective), chills, rigors, myalgia, headache, sore throat, or new olfactory and taste disorder(s).

233.   Second, a case meets the clinical criteria if there is no alternative more likely diagnosis and at least one of the following symptoms are present:   cough, shortness of breath, or difficulty breathing.

234.   Third, a case meets the clinical criteria if there is no alternative more likely diagnosis and a patient suffers from severe respiratory illness with at least one of either clinical or radiographic evidence of pneumonia or acute respiratory distress syndrome.

235.   The interim definition also provided that a case meets the laboratory criteria if there are positive results returned from a diagnostic test, an antigen test, or an antibody test.

236.   And, the CDC and CSTE identified a number of "epidemiological" criteria that should be considered when evaluating a potential COVID-19 case. Specifically, whether the patient was within 6 feet for 10 to 30 minutes or more with a person who has a confirmed or probable COVID-19 case; whether the patient was within 6 feet for 10 to 30 minutes or more with a person with a "clinically compatible illness" and some link exists to a confirmed COVID-19 case; whether the patient traveled to or resided in an area with sustained, ongoing community transmission of COVID-19; and/or whether the patient is a member of an at-risk cohort.

237.   Patients who meet both the clinical and epidemiological criteria are considered probable COVID-19 cases, as are those patients who presumptively meet the laboratory criteria and either the clinical or epidemiological criteria.

238.   The position statement also recognized that "field investigations will involve evaluations of persons with no symptoms and these individuals will need to be counted as cases."

239.   In addition to the above-listed clinical criteria, the CDC has published more up-to-date information regarding the range of symptoms created by COVID-19. This list, which the CDC concedes is not comprehensive, includes:

      a.  Fever or chills

      b.  Cough

      c.  Shortness of breath or difficulty breathing

      d.  Fatigue

      e.  Muscle or body aches

      f.  Headache

      g.  New loss of taste or smell

      h.  Sore throat

      i.  Congestion or runny nose

      j.  Nausea or vomiting

      k.  Diarrhea [76]

240.   Plaintiff IRIS HOUSE and Decedent MICHAEL HOUSE were exposed, in close proximity for extended periods of time, to individuals who were or were probably carrying COVID-19, including crew members onboard the *GRAND PRINCESS* and their fellow passengers.

241.   Plaintiff IRIS HOUSE and Decedent MICHAEL HOUSE likewise effectively "resided in" for over two weeks in a community—the cruise ship—that experienced sustained and ongoing transmission, as is evidenced by the vast numbers of passengers onboard the vessel who became ill with COVID-19. Plaintiff IRIS HOUSE and Decedent MICHAEL HOUSE also suffered symptoms consistent with the clinical criteria identified by the CDC and CSTE.

///

---

[76]  Center for Disease Control and Prevention, Symptoms of Coronavirus, Updated May 13, 2020 https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html#   (last   visited August 14, 2020).

### COUNT ONE

### FOR  NEGLIGENCE, WRONGFUL DEATH AND SURVIVAL DAMAGES

### (Against All Defendants)

242.  Plaintiffs hereby incorporate by reference, as though fully set forth herein, paragraphs 1-241, and allege as follows.

243.  At all times material, Defendants owed a duty to their passengers, including Plaintiff IRIS HOUSE and Decedent MICHAEL HOUSE, to exercise reasonable care for the health, welfare, and safety of their passengers.

244.  At all times material, Defendants' duty of reasonable care under the circumstances included, but was not limited to, providing their passengers, including Plaintiff IRIS HOUSE and Decedent MICHAEL HOUSE timely and adequate warnings of hazardous conditions on the vessel, including passengers with highly infectious diseases such as COVID-19 that Defendants knew and/or should have known about upon reasonable inspection. Defendants' failure to do so foreseeably and proximately caused harm to Plaintiff IRIS HOUSE, and foreseeably and proximately caused harm to (and the death of) MICHAEL HOUSE.

245.  At all times material, Defendants, by and through its vessel, crew, agents, servants, officers, staff and/or employees, who were acting in the course and scope of their employment and/or agency, undertook to create a dangerous and hazardous condition.

246.  Defendants knew or should have known of the actual, unique risk of viral contagion of COVID-19 aboard cruise ships, and, in light of the situation on the *DIAMOND PRINCESS* only three weeks prior to the instant voyage on the *GRAND PRINCESS*, Defendants knew or should have known that it was especially dangerous to expose Plaintiff IRIS HOUSE and Decedent MICHAEL HOUSE to COVID-19.

247.  Defendants also knew or should have known that passengers aboard the San Francisco-to-Mexico trip on the *GRAND PRINCESS* had experienced symptoms of COVID-19 and were eventually diagnosed with COVID-19.

248.   Nevertheless, Defendants chose to board Plaintiff IRIS HOUSE and MICHAEL HOUSE onto the *GRAND PRINCESS* on February 21, 2020 without instituting any procedures for medical screening or examination. Defendants then chose to embark upon the Hawaii-bound voyage, essentially trapping Plaintiff IRIS HOUSE and MICHAEL HOUSE, on a vessel infested with COVID-19, and likely exacerbated the spread of the virus aboard the ship. Throughout the duration of the trip, Defendants continually and repeatedly acted or failed to act in ways that caused Plaintiffs to be exposed to COVID-19, including but not limited to:  failing to take any effective actions to prevent or mitigate the spread of COVID-19 throughout the crew members and/or passengers; failing to alert passengers to the possibility of infection aboard the ship; and hosting and encouraging participation in large group activities and events that Defendants knew could lead to large-scale infection among the crew and passengers.

249.   These choices by Defendants created a dangerous and threatening environment in which Plaintiff IRIS HOUSE and MICHAEL HOUSE were forced to live on for two weeks, at all times directly exposed to COVID-19 and at risk of becoming infected with, made ill by, and/or spreading COVID-19.

250.   At all times material, Defendants, by and through their vessel, crew, agents, servants, officers, staff and/or employees, who were acting in the course and scope of their employment and/or agency, were negligent, careless and breached their duty of care to Plaintiffs, by committing the following acts and/or omissions, including, but not limited to:

    a.  Failing to maintain the vessel in a reasonably safe condition; and/or

    b.  Failing to warn Plaintiffs of the dangerous conditions on the subject passenger vessel; and/or

    c.  Creating a dangerous condition and/or failing to remedy a dangerous condition which was known by the Defendants and which in the exercise of reasonable care should have been known by the Defendants; and/or

d.  Negligently designing and/or approving a dangerous condition; and/or

e.  Failing to adopt and implement proper and adequate policies, protocols and procedures to prevent crewmembers from creating hazardous conditions to passengers; and/or

f.  Failing to take feasible and reasonable steps to eliminate a dangerous condition which was known by the Defendants and which in the exercise of reasonable care should have been known by the Defendants; and/or

g.  Failing to implement any effective COVID-19 medical screening or examination procedures for crew or passengers who remained onboard from the Mexican Rivera Cruise and were continuing on for the Hawaii voyage; and/or

h.  Allowing and encouraging the 68 passengers (and 1,000 + crew) from the Mexican Riviera Cruise to roam freely around the ship, congregate, and be in close contact and interact with the Hawaii Cruise passengers; and/or

i.  Failing to properly sanitize or disinfect the vessel in-between voyages;

j.  Failing to implement any procedures for screening or testing existing or new passengers boarding the ship for the Hawaii-bound voyage; and/or

k.  Failing to notify passengers who were scheduled to board the vessel on February 21, 2020, that passengers from the prior Mexico trip had reported COVID-19 symptoms, or of the fact that passengers remaining on board the GRAND PRINCESS had been exposed to and might be infected with and/or carrying the virus; and/or

l.  Failing to promptly and adequately implement the highest-level protocols for outbreaks despite: 1) Defendants' awareness of the unique risks created by the cruise ship environment, 2) the August, 2016, CDC Guidance for Cruise Ships on Influenza-like Illness ("ILI") Management, 3) Dr. Grant Tarling's prior experience with the science of respiratory and communicable disease outbreaks on cruise ships, 4) the January 24, 2020, United States Coast Guard Marine Information Bulletin, 5) the January 30, 2020, WHO declaration that COVID-19 was a public

health emergency of international concern, 6) the January 31, 2020, United States suspension of travel and entry of all of foreign nationals present in China, 7) the January 31, 2020 Department of Transportation Advisory, 8) the February 3, 2020, European Union's Health Gateways Joint Action "Advice for ship operators for preparedness and response to outbreak of 2019-nCov acute respiratory disease," 9) PCL's recent experience with COVID-19 outbreaks on other vessels in the fleet, including the *DIAMOND PRINCESS*, 10) the February 13, 2020, CDC Guidance for Ships on Managing Suspected Coronavirus Disease 2019, 11) learning of a COVID-19 outbreak among passengers and crew of the prior Mexican Riviera Cruise– from which 68 passengers and thousands of crew remained in the Hawaii Cruise; and/or

m. Continuing business operations as usual in the rest of the fleet, including the *GRAND PRINCESS* despite: 1) Defendants' awareness of the unique risks created by the cruise ship environment, 2) the August, 2016, CDC Guidance for Cruise Ships on Influenza-like Illness ("ILI") Management, 3) Dr. Grant Tarling's prior experience with the science of respiratory and communicable disease outbreaks on cruise ships, 4) the January 24, 2020, United States Coast Guard Marine Information Bulletin, 5) the January 30, 2020, WHO declaration that COVID-19 was a public health emergency of international concern, 6) the January 31, 2020, United States suspension of travel and entry of all of foreign nationals present in China, 7) the January 31, 2020 Department of Transportation Advisory, 8) the February 3, 2020, European Union's Health Gateways Joint Action "Advice for ship operators for preparedness and response to outbreak of 2019-nCov acute respiratory disease," 9) PCL's recent experience with COVID-19 outbreaks on other vessels in the fleet, including the *DIAMOND PRINCESS*, 10) the February 13, 2020 CDC Guidance for Ships on Managing Suspected Coronavirus Disease 2019, and 11) learning of a COVID-19 outbreak among passengers and crew of the prior Mexican Riviera Cruise– from which 68 passengers and thousands of crew remained in the Hawaii Cruise; and/or

n.  Failing to cancel itineraries in the rest of the fleet, including the *GRAND PRINCESS* despite: 1) Defendants' awareness of the unique risks created by the cruise ship environment, 2) the August, 2016, CDC Guidance for Cruise Ships on Influenza-like Illness ("ILI") Management, 3) Dr. Grant Tarling's prior experience with the science of respiratory and communicable disease outbreaks on cruise ships, 4) the January 24, 2020, United States Coast Guard Marine Information Bulletin, 5) the January 30, 2020, WHO declaration that COVID-19 was a public health emergency of international concern, 6) the January 31, 2020, United States suspension of travel and entry of all of foreign nationals present in China, 7) the January 31, 2020 Department of Transportation Advisory, 8) the February 3, 2020, European Union's Health Gateways Joint Action "Advice for ship operators for preparedness and response to outbreak of 2019-nCov acute respiratory disease," 9) PCL's experience with recent COVID-19 outbreaks on other vessels in the fleet, including the *DIAMOND PRINCESS*, 10) the February 13, 2020 CDC Guidance for Ships on Managing Suspected Coronavirus Disease 2019, and 11) learning of a COVID-19 outbreak among passengers and crew of the prior Mexican Riviera Cruise– from which 68 passengers and thousands of crew remained in the Hawaii Cruise; and/or

o.  Failing to timely and adequately warn passengers of the extent of the outbreak on the PCL fleet, including the *GRAND PRINCESS* despite: 1) Defendants' awareness of the unique risks created by the cruise ship environment, 2) the August, 2016, CDC Guidance for Cruise Ships on Influenza-like Illness ("ILI") Management, 3) Dr. Grant Tarling's prior experience with the science of respiratory and communicable disease outbreaks on cruise ships, 4) the January 24, 2020, United States Coast Guard Marine Information Bulletin, 5) the January 30, 2020, WHO declaration that COVID-19 was a public health emergency of international concern, 6) the January 31, 2020, United States suspension of travel and entry of all of foreign nationals present in China, 7) the January 31, 2020 Department of Transportation

Plaintiff's Complaint and Demand for Jury Trial

Advisory, 8) the February 3, 2020, European Union's Health Gateways Joint Action "Advice for ship operators for preparedness and response to outbreak of 2019-nCov acute respiratory disease," 9) PCL's recent experience with COVID-19 outbreaks on other vessels in the fleet, including the *DIAMOND PRINCESS*, 10) the February 13, 2020 CDC Guidance for Ships on Managing Suspected Coronavirus Disease 2019, 11) learning of a COVID-19 outbreak among passengers and crew of the prior Mexican Riviera Cruise– from which 68 passengers and thousands of crew remained in the Hawaii Cruise, and 12) sending an e-mail, on or about February 25, 2020, to passengers of the prior Mexican Riviera Cruise alerting them of a potential exposure to COVID-19 during their time on the cruise; and/or

      p. Failing to implement adequate measures to mitigate the spread of COVID-19 on the rest of the fleet, including the *GRAND PRINCESS* despite: 1) Defendants' awareness of the unique risks created by the cruise ship environment, 2) the August, 2016, CDC Guidance for Cruise Ships on Influenza-like Illness ("ILI") Management, 3) Dr. Grant Tarling's prior experience with the science of respiratory and communicable disease outbreaks on cruise ships, 4) the January 24, 2020, United States Coast Guard Marine Information Bulletin, 5) the January 30, 2020, WHO declaration that COVID-19 was a public health emergency of international concern, 6) the January 31, 2020, United States suspension of travel and entry of all of foreign nationals present in China, 7) the January 31, 2020 Department of Transportation Advisory, 8) the February 3, 2020, European Union's Health Gateways Joint Action "Advice for ship operators for preparedness and response to outbreak of 2019-nCov acute respiratory disease," 9) PCL's recent experience with COVID-19 outbreaks on other vessels in the fleet, including the *DIAMOND PRINCESS*, 10) the February 13, 2020 CDC Guidance for Ships on Managing Suspected Coronavirus Disease 2019, and 11) learning of a COVID-19 outbreak among passengers and crew of the prior Mexican Riviera Cruise– from which 68 passengers and thousands of crew remained in the Hawaii Cruise; and/or

q.  Allowing and encouraging passengers to roam freely around the ship, congregate in crowded restaurants, theaters, bars, casinos, and gyms, foreseeably leading to the spread of the virus despite: 1) Defendants' awareness of the unique risks created by the cruise ship environment, 2) the August, 2016, CDC Guidance for Cruise Ships on Influenza-like Illness ("ILI") Management, 3) Dr. Grant Tarling's prior experience with the science of respiratory and communicable disease outbreaks on cruise ships, 4) the January 24, 2020, United States Coast Guard Marine Information Bulletin, 5) the January 30, 2020, WHO declaration that COVID-19 was a public health emergency of international concern, 6) the January 31, 2020, United States suspension of travel and entry of all of foreign nationals present in China, 7) the January 31, 2020 Department of Transportation Advisory, 8) the February 3, 2020, European Union's Health Gateways Joint Action "Advice for ship operators for preparedness and response to outbreak of 2019-nCov acute respiratory disease," 9) PCL's recent experience with COVID-19 outbreaks on other vessels in the fleet, including the *DIAMOND PRINCESS*, 10) the February 13, 2020 CDC Guidance for Ships on Managing Suspected Coronavirus Disease 2019, 11) learning of a COVID-19 outbreak among passengers and crew of the prior Mexican Riviera Cruise– from which 68 passengers and thousands of crew remained in the Hawaii Cruise, 12) sending an e-mail, on or about February 25, 2020, to passengers of the prior Mexican Riviera Cruise alerting them of a potential exposure to COVID-19 during their time on the cruise, 13) Governor Gavin Newsom's March 4, 2020, declaration of a state of emergency in California to manage the COVID-19 outbreak;

r.  Failing to promptly and properly isolate all passengers and crew who had face-to-face contact with infected passengers from the prior itinerary (Mexica Rivera Cruise);

s.  Failing to comply with, and implement, the August, 2016, CDC Guidance for Cruise Ships on Influenza-like Illness ("ILI") Management;

Plaintiff's Complaint and Demand for Jury Trial

t.  Failing to comply with, and implement, the February 3, 2020, European Union's Health Gateways Joint Action "Advice for ship operators for preparedness and response to outbreak of 2019-nCov acute respiratory disease;"

u.  Failing to comply with, and implement, the February 13, 2020 CDC Guidance for Ships on Managing Suspected Coronavirus Disease 2019;

v.  Failing to require shipboard officers and shoreside managers to be on high alert and ready to promptly and effectively implement outbreak mitigation measures;

w. Failing to promptly and adequately implement and conduct contact-tracing procedures;

x.  Failing to carry adequate and sufficient supplies of personal protective equipment supplies for all passengers and crew;

y.  Allowing the outbreak to spread out of control by failing to adequately and timely cancel all inboard ship activities, including but not limited buffet lines, dining areas, theaters, onboard celebrations, opera performances, housekeeping visits, parties, etc.;

z.  Failing to promptly and adequately require passengers and crew to handwash, practice social distancing and wear personal protective equipment after learning of infected passengers and crew had been on the ship during the prior itinerary (Mexican Rivera Cruise);

aa. Limiting the flow of information to passengers and downplaying the risks of the outbreak;

bb. Failing to safely distribute food and beverages to passengers during the quarantine; and/or

cc. Failing to create and/or implement adequate policies and procedures to ensure that food and beverages could be safely distributed to passengers' cabins in quarantine during a viral outbreak; and/or

Plaintiff's Complaint and Demand for Jury Trial

dd. Failing to prevent crewmembers from all vessel departments to roam and congregate freely after implementing the mandatory quarantine for passengers; and/or

ee. Requiring crewmember to have multiple face-to-face interactions with passengers, multiple times per day, during meal and beverage deliveries; and/or

ff. Delivering beverages and food in open containers, potentially exposing it to the contaminated droplets of infected passengers and/or crew; and/or

gg. Delivering meals, beverages and games to passengers wearing the same pair of gloves and other personal protective equipment to dozens of cabins at a time; and/or

hh. Failing to segregate and distinguish infection-free "green zones" from potentially contaminated "red zones;" and/or

ii. Failing to prevent crewmembers from transiting freely between infection zones without adequate personal protective equipment;

jj. Failing to safely disembark and evacuate passengers from the *GRAND PRINCESS*, including requiring them to remain for hours in crowded conditions and enclosed areas within close proximity to other potentially infected passengers and crew; and/or

kk. Failing to prevent crewmembers from collecting dirty dishes and used linens without adequate protective gear; and/or

ll. Failing to provide passengers a safe and sanitary vessel in violation of the CDC's VSP protocols; and/or

mm. All other acts or omissions constituting a breach of Defendants' duty to use reasonable care discovered during litigation.

251. At all material times, PCL had exclusive custody and control of the above-named vessel.

252. At all material times, PCL created and/or knew or should have known of the above-described conditions through the exercise of reasonable care.

253.   At all material times, PCL negligently failed to determine the hazards on the vessel to Plaintiff, failed to eliminate the hazard, failed to modify the hazard and failed to properly warn Plaintiff of the hazard.

254.   The above conditions were neither open nor obvious to Plaintiffs, and accordingly, PCL owed Plaintiff IRIS HOUSE and decedent MICHAEL HOUSE, the duty to properly warn and/or correct them.

255.   As a direct and proximate result of the acts and omissions of Defendants, Decedent MICHAEL HOUSE contracted COVID-19, while he was cruising on the *GRAND PRINCESS* within the 3-mile limit of the territorial waters of the State of Hawaii.

256.   As a direct and proximate result of the acts and omissions of Defendants, MICHAEL HOUSE died from COVID-19.

257.   As a direct and proximate result of the acts and omissions of Defendants, MICHAEL HOUSE, prior to his death, experienced physical pain, mental suffering, grief, anxiety and emotional distress, in amount to be determined according to proof at trial.

258.   As a further and direct and proximate cause of the acts and omissions of Defendants, IRIS HOUSE, decedent MICHAEL HOUSE's wife, has suffered, is suffering, and will suffer in the future the following damages:

    a.   Mental pain and suffering;

    b.   The financial support that MICHAEL HOUSE would have contributed to IRIS HOUSE, during MICHAEL HOUSE's life expectancy before his death;

    c.   Loss of gifts or benefits that IRIS HOUSE would have expected to receive from MICHAEL HOUSE;

    d.   Funeral and burial expenses;

    e.   Reasonable value of household services that MICHAEL HOUSE would have provided;

f.  Medical and incidental expenses incurred to provide medical treatment and care to MICHAEL HOUSE prior to his death;

g.  Loss of MICHAEL HOUSE's love, companionship, comfort, care, society, consortium, assistance, protection, affection, and moral support;

h.  Loss of enjoyment of marital relations; and

i.  Loss of MICHAEL HOUSE's training and guidance.

259.  As a further and direct and proximate cause of the acts and omissions of Defendants, ELTON HOUSE, decedent MICHAEL HOUSE's son, has suffered, is suffering, and will suffer in the future the following damages:

a.  Mental pain and suffering;

b.  The financial support that MICHAEL HOUSE would have contributed to ELTON HOUSE, during MICHAEL HOUSE's life expectancy before his death;

c.  Loss of gifts or benefits that ELTON HOUSE would have expected to receive from MICHAEL HOUSE;

d.  Funeral and burial expenses;

e.  Reasonable value of household services that MICHAEL HOUSE would have provided;

f.  Medical and incidental expenses incurred to provide medical treatment and care to MICHAEL HOUSE prior to his death;

g.  Loss of MICHAEL HOUSE's love, companionship, comfort, care, assistance, protection, affection, and moral support;

h.  Loss of MICHAEL HOUSE's training and guidance.

260.  As a further and direct and proximate cause of the acts and omissions of Defendants, ANDREW HOUSE, decedent MICHAEL HOUSE's son, has suffered, is suffering, and will suffer in the future the following damages:

a.  Mental pain and suffering;

b.  The financial support that MICHAEL HOUSE would have contributed to ANDREW HOUSE, during MICHAEL HOUSE's life expectancy before his death;

c.  Loss of gifts or benefits that ANDREW HOUSE would have expected to receive from MICHAEL HOUSE;

d.  Funeral and burial expenses;

e.  Reasonable value of household services that MICHAEL HOUSE would have provided;

f.  Medical and incidental expenses incurred to provide medical treatment and care to MICHAEL HOUSE prior to his death;

g.  Loss of MICHAEL HOUSE's love, companionship, comfort, care, assistance, protection, affection, and moral support;

h.  Loss of MICHAEL HOUSE's training and guidance.

261.  Plaintiffs claim all damages available under law, including the General Maritime Law of the United States, according to proof at trial.  Said damages are in excess of the jurisdictional limits of the Court. Plaintiff further demands a trial by jury on all issues so triable as a matter of right.

## COUNT TWO

## IRIS HOUSE'S INDIVIDUAL CLAIM FOR NEGLIGENCE

### (Against All Defendants)

262.  Plaintiff hereby incorporates by reference, as though fully set forth herein, paragraphs 1-241, and alleges as follows.

263.  At all times material, Defendants owed a duty to their passengers, including Plaintiff IRIS HOUSE, to exercise reasonable care for the health, welfare, and safety of their passengers.

264.  At all times material, Defendants' duty of reasonable care under the circumstances included, but was not limited to, providing their passengers, including Plaintiff IRIS HOUSE timely and adequate warnings of hazardous conditions on the

vessel, including passengers with highly infectious diseases such as COVID-19 that Defendants knew and/or should have known about upon reasonable inspection. Defendants' failure to do so foreseeably and proximately caused harm to Plaintiff IRIS HOUSE.

265.   At all times material, Defendants, by and through its vessel, crew, agents, servants, officers, staff and/or employees, who were acting in the course and scope of their employment and/or agency, undertook to create a dangerous and hazardous condition.

266.   Defendants knew or should have known of the actual, unique risk of viral contagion of COVID-19 aboard cruise ships, and, in light of the situation on the *DIAMOND PRINCESS* only three weeks prior to the instant voyage on the *GRAND PRINCESS*, Defendants knew or should have known that it was especially dangerous to expose Plaintiff IRIS HOUSE and Decedent MICHAEL HOUSE to COVID-19.

267.   Defendants also knew or should have known that passengers aboard the San Francisco-to-Mexico trip on the *GRAND PRINCESS* had experienced symptoms of COVID-19 and were eventually diagnosed with COVID-19.

268.   Nevertheless, Defendants chose to board Plaintiff IRIS HOUSE and MICHAEL HOUSE onto the GRAND PRINCESS on February 21, 2020 without instituting any procedures for medical screening or examination. Defendants then chose to embark upon the Hawaii-bound voyage, essentially trapping Plaintiff IRIS HOUSE on a vessel infested with COVID-19, and likely exacerbated the spread of the virus aboard the ship. Throughout the duration of the trip, Defendants continually and repeatedly acted or failed to act in ways that caused Plaintiffs to be exposed to COVID-19, including but not limited to:  failing to take any effective actions to prevent or mitigate the spread of COVID-19 throughout the crew members and/or passengers; failing to alert passengers to the possibility of infection aboard the ship; and hosting and encouraging participation in large group activities and events that Defendants knew could lead to large-scale infection among the crew and passengers.

269.  These choices by Defendants created a dangerous and threatening environment in which Plaintiff IRIS HOUSE and MICHAEL HOUSE were forced to live on for two weeks, at all times directly exposed to COVID-19 and at risk of becoming infected with, made ill by, and/or spreading COVID-19.

270.  At all times material, Defendants, by and through their vessel, crew, agents, servants, officers, staff and/or employees, who were acting in the course and scope of their employment and/or agency, were negligent, careless and breached their duty of care to Plaintiffs, by committing the following acts and/or omissions, including, but not limited to:

a.  Failing to maintain the vessel in a reasonably safe condition; and/or

b.  Failing to warn Plaintiffs of the dangerous conditions on the subject passenger vessel; and/or

c.  Creating a dangerous condition and/or failing to remedy a dangerous condition which was known by the Defendants and which in the exercise of reasonable care should have been known by the Defendants; and/or

d.  Negligently designing and/or approving a dangerous condition; and/or

e.  Failing to adopt and implement proper and adequate policies, protocols and procedures to prevent crewmembers from creating hazardous conditions to passengers; and/or

f.  Failing to take feasible and reasonable steps to eliminate a dangerous condition which was known by the Defendants and which in the exercise of reasonable care should have been known by the Defendants; and/or

g.  Failing to implement any effective COVID-19 medical screening or examination procedures for crew or passengers who remained onboard from the Mexican Rivera Cruise and were continuing on for the Hawaii voyage; and/or

h.  Allowing and encouraging the 68 passengers (and 1,000 + crew) from the Mexican Riviera Cruise to roam freely around the ship, congregate, and be in close contact and interact with the Hawaii Cruise passengers; and/or

i. Failing to properly sanitize or disinfect the vessel in-between voyages; and/or

j. Failing to implement any procedures for screening or testing existing or new passengers boarding the ship for the Hawaii-bound voyage; and/or

k. Failing to notify passengers who were scheduled to board the vessel on February 21, 2020, that passengers from the prior Mexico trip had reported COVID-19 symptoms, or of the fact that passengers remaining on board the *GRAND PRINCESS* had been exposed to and might be infected with and/or carrying the virus; and/or

l. Failing to promptly and adequately implement the highest-level protocols for outbreaks despite: 1) Defendants' awareness of the unique risks created by the cruise ship environment, 2) the August, 2016, CDC Guidance for Cruise Ships on Influenza-like Illness ("ILI") Management, 3) Dr. Grant Tarling's prior experience with the science of respiratory and communicable disease outbreaks on cruise ships, 4) the January 24, 2020, United States Coast Guard Marine Information Bulletin, 5) the January 30, 2020, WHO declaration that COVID-19 was a public health emergency of international concern, 6) the January 31, 2020, United States suspension of travel and entry of all of foreign nationals present in China, 7) the January 31, 2020 Department of Transportation Advisory, 8) the February 3, 2020, European Union's Health Gateways Joint Action "Advice for ship operators for preparedness and response to outbreak of 2019-nCov acute respiratory disease," 9) PCL's recent experience with COVID-19 outbreaks on other vessels in the fleet, including the *DIAMOND PRINCESS*, 10) the February 13, 2020, CDC Guidance for Ships on Managing Suspected Coronavirus Disease 2019, 11) learning of a COVID-19 outbreak among passengers and crew of the prior Mexican Riviera Cruise– from which 68 passengers and thousands of crew remained in the Hawaii Cruise; and/or

m. Continuing business operations as usual in the rest of the fleet, including the *GRAND PRINCESS* despite: 1) Defendants' awareness of the unique risks created

Plaintiff's Complaint and Demand for Jury Trial

by the cruise ship environment, 2) the August, 2016, CDC Guidance for Cruise Ships on Influenza-like Illness ("ILI") Management, 3) Dr. Grant Tarling's prior experience with the science of respiratory and communicable disease outbreaks on cruise ships, 4) the January 24, 2020, United States Coast Guard Marine Information Bulletin, 5) the January 30, 2020, WHO declaration that COVID-19 was a public health emergency of international concern, 6) the January 31, 2020, United States suspension of travel and entry of all of foreign nationals present in China, 7) the January 31, 2020 Department of Transportation Advisory, 8) the February 3, 2020, European Union's Health Gateways Joint Action "Advice for ship operators for preparedness and response to outbreak of 2019-nCov acute respiratory disease," 9) PCL's recent experience with COVID-19 outbreaks on other vessels in the fleet, including the *DIAMOND PRINCESS*, 10) the February 13, 2020 CDC Guidance for Ships on Managing Suspected Coronavirus Disease 2019, and 11) learning of a COVID-19 outbreak among passengers and crew of the prior Mexican Riviera Cruise– from which 68 passengers and thousands of crew remained in the Hawaii Cruise; and/or

n.   Failing to cancel itineraries in the rest of the fleet, including the *GRAND PRINCESS* despite: 1) Defendants' awareness of the unique risks created by the cruise ship environment, 2) the August, 2016, CDC Guidance for Cruise Ships on Influenza-like Illness ("ILI") Management, 3) Dr. Grant Tarling's prior experience with the science of respiratory and communicable disease outbreaks on cruise ships, 4) the January 24, 2020, United States Coast Guard Marine Information Bulletin, 5) the January 30, 2020, WHO declaration that COVID-19 was a public health emergency of international concern, 6) the January 31, 2020, United States suspension of travel and entry of all of foreign nationals present in China, 7) the January 31, 2020 Department of Transportation Advisory, 8) the February 3, 2020, European Union's Health Gateways Joint Action "Advice for ship operators for preparedness and response to outbreak of 2019-nCov acute respiratory disease," 9) PCL's recent experience with COVID-19 outbreaks on other vessels in the fleet, including the

*DIAMOND PRINCESS*, 10) the February 13, 2020 CDC Guidance for Ships on Managing Suspected Coronavirus Disease 2019, and 11) learning of a COVID-19 outbreak among passengers and crew of the prior Mexican Riviera Cruise– from which 68 passengers and thousands of crew remained in the Hawaii Cruise; and/or

o. Failing to timely and adequately warn passengers of the extent of the outbreak on the PCL fleet, including the *GRAND PRINCESS* despite: 1) Defendants' awareness of the unique risks created by the cruise ship environment, 2) the August, 2016, CDC Guidance for Cruise Ships on Influenza-like Illness ("ILI") Management, 3) Dr. Grant Tarling's prior experience with the science of respiratory and communicable disease outbreaks on cruise ships, 4) the January 24, 2020, United States Coast Guard Marine Information Bulletin, 5) the January 30, 2020, WHO declaration that COVID-19 was a public health emergency of international concern, 6) the January 31, 2020, United States suspension of travel and entry of all of foreign nationals present in China, 7) the January 31, 2020 Department of Transportation Advisory, 8) the February 3, 2020, European Union's Health Gateways Joint Action "Advice for ship operators for preparedness and response to outbreak of 2019-nCov acute respiratory disease," 9) PCL's recent experience with COVID-19 outbreaks on other vessels in the fleet, including the *DIAMOND PRINCESS*, 10) the February 13, 2020 CDC Guidance for Ships on Managing Suspected Coronavirus Disease 2019, 11) learning of a COVID-19 outbreak among passengers and crew of the prior Mexican Riviera Cruise– from which 68 passengers and thousands of crew remained in the Hawaii Cruise, and 12) sending an e-mail, on or about February 25, 2020, to passengers of the prior Mexican Riviera Cruise alerting them of a potential exposure to COVID-19 during their time on the cruise; and/or

p. Failing to implement adequate measures to mitigate the spread of COVID-19 on the rest of the fleet, including the *GRAND PRINCESS* despite: 1) Defendants' awareness of the unique risks created by the cruise ship environment, 2) the August, 2016, CDC Guidance for Cruise Ships on Influenza-like Illness ("ILI")

Management, 3) Dr. Grant Tarling's prior experience with the science of respiratory and communicable disease outbreaks on cruise ships, 4) the January 24, 2020, United States Coast Guard Marine Information Bulletin, 5) the January 30, 2020, WHO declaration that COVID-19 was a public health emergency of international concern, 6) the January 31, 2020, United States suspension of travel and entry of all of foreign nationals present in China, 7) the January 31, 2020 Department of Transportation Advisory, 8) the February 3, 2020, European Union's Health Gateways Joint Action "Advice for ship operators for preparedness and response to outbreak of 2019-nCov acute respiratory disease," 9) PCL's recent experience with COVID-19 outbreaks on other vessels in the fleet, including the *DIAMOND PRINCESS*, 10) the February 13, 2020 CDC Guidance for Ships on Managing Suspected Coronavirus Disease 2019, and 11) learning of a COVID-19 outbreak among passengers and crew of the prior Mexican Riviera Cruise– from which 68 passengers and thousands of crew remained in the Hawaii Cruise; and/or

q. Allowing and encouraging passengers to roam freely around the ship, congregate in crowded restaurants, theaters, bars, casinos, and gyms, foreseeably leading to the spread of the virus despite: 1) Defendants' awareness of the unique risks created by the cruise ship environment, 2) the August, 2016, CDC Guidance for Cruise Ships on Influenza-like Illness ("ILI") Management, 3) Dr. Grant Tarling's prior experience with the science of respiratory and communicable disease outbreaks on cruise ships, 4) the January 24, 2020, United States Coast Guard Marine Information Bulletin, 5) the January 30, 2020, WHO declaration that COVID-19 was a public health emergency of international concern, 6) the January 31, 2020, United States suspension of travel and entry of all of foreign nationals present in China, 7) the January 31, 2020 Department of Transportation Advisory, 8) the February 3, 2020, European Union's Health Gateways Joint Action "Advice for ship operators for preparedness and response to outbreak of 2019-nCov acute respiratory disease," 9) PCL's recent experience with COVID-19 outbreaks on other vessels in the fleet,

including the *DIAMOND PRINCESS*, 10) the February 13, 2020 CDC Guidance for Ships on Managing Suspected Coronavirus Disease 2019, 11) learning of a COVID-19 outbreak among passengers and crew of the prior Mexican Riviera Cruise– from which 68 passengers and thousands of crew remained in the Hawaii Cruise, 12) sending an e-mail, on or about February 25, 2020, to passengers of the prior Mexican Riviera Cruise alerting them of a potential exposure to COVID-19 during their time on the cruise, 13) Governor Gavin Newsom's March 4, 2020, declaration of a state of emergency in California to manage the COVID-19 outbreak;

r.   Failing to promptly and properly isolate all passengers and crew who had face-to-face contact with infected passengers from the prior itinerary (Mexica Rivera Cruise);

s.   Failing to comply with, and implement, the August, 2016, CDC Guidance for Cruise Ships on Influenza-like Illness ("ILI") Management;

t.   Failing to comply with, and implement, the February 3, 2020, European Union's Health Gateways Joint Action "Advice for ship operators for preparedness and response to outbreak of 2019-nCov acute respiratory disease;"

u.   Failing to comply with, and implement, the February 13, 2020 CDC Guidance for Ships on Managing Suspected Coronavirus Disease 2019;

v.   Failing to require shipboard officers and shoreside managers to be on high alert and ready to promptly and effectively implement outbreak mitigation measures;

w.   Failing to promptly and adequately implement and conduct contact-tracing procedures;

x.   Failing to carry adequate and sufficient supplies of personal protective equipment supplies for all passengers and crew;

y.   Allowing the outbreak to spread out of control by failing to adequately and timely cancel all inboard ship activities, including but not limited buffet lines,

dining areas, theaters, onboard celebrations, opera performances, housekeeping visits, parties, etc.;

z. Failing to promptly and adequately require passengers and crew to handwash, practice social distancing and wear personal protective equipment after learning of infected passengers and crew had been on the ship during the prior itinerary (Mexican Rivera Cruise);

aa. Limiting the flow of information to passengers and downplaying the risks of the outbreak;

bb. Failing to safely distribute food and beverages to passengers during the quarantine; and/or

cc. Failing to create and/or implement adequate policies and procedures to ensure that food and beverages could be safely distributed to passengers' cabins in quarantine during a viral outbreak; and/or

dd. Failing to prevent crewmembers from all vessel departments to roam and congregate freely after implementing the mandatory quarantine for passengers; and/or

ee. Requiring crewmember to have multiple face-to-face interactions with passengers, multiple times per day, during meal and beverage deliveries; and/or

ff. Delivering beverages and food in open containers, potentially exposing it to the contaminated droplets of infected passengers and/or crew; and/or

gg. Delivering meals, beverages and games to passengers wearing the same pair of gloves and other personal protective equipment to dozens of cabins at a time; and/or

hh. Failing to segregate and distinguish infection-free "green zones" from potentially contaminated "red zones;" and/or

ii. Failing to prevent crewmembers from transiting freely between infection zones without adequate personal protective equipment;

jj. Failing to safely disembark and evacuate passengers from the *GRAND PRINCESS*, including requiring them to remain for hours in crowded conditions and

enclosed areas within close proximity to other potentially infected passengers and crew; and/or

kk.Failing to prevent crewmembers from collecting dirty dishes and used linens without adequate protective gear; and/or

ll.   Failing to provide passengers a safe and sanitary vessel in violation of the CDC's VSP protocols; and/or

mm.      All other acts or omissions constituting a breach of Defendants' duty to use reasonable care discovered during litigation.

271.   At all material times, PCL had exclusive custody and control of the above-named vessel.

272.   At all material times, PCL created and/or knew or should have known of the above-described conditions through the exercise of reasonable care.

273.   At all material times, PCL negligently failed to determine the hazards on the vessel to Plaintiff, failed to eliminate the hazard, failed to modify the hazard and failed to properly warn Plaintiff of the hazard.

274.   The above conditions were neither open nor obvious to Plaintiffs, and accordingly, PCL owed Plaintiff, the duty to properly warn and/or correct them.

275.    As a direct and proximate result of Defendants' negligence, Plaintiff IRIS HOUSE contracted COVID-19, while she was on board the *GRAND PRINCESS*.

276.   As a further and direct proximate result of the acts and omissions of Defendants, Plaintiff IRIS HOUSE suffered severe and permanent injuries, pain and suffering, disability, mental anguish, inconvenience, the loss of capacity for enjoyment of life, and has incurred medical expenses in the past and will incur medical expenses in the future.  All of said damages are permanent and continuing in nature.

277.   As a direct and proximate cause of the aforementioned conduct of Defendants, and each of them, Plaintiff IRIS HOUSE was required to, and did, employ physicians and other medical professionals to examine, treat, care for, and

rehabilitate her, and did incur medical and incidental expenses, and will require to do so in the future.  All of said damages are permanent and continuing in nature.

## COUNT THREE

## IRIS HOUSE'S INDIVIDUAL CLAIM FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### (Against All Defendants)

278.  Plaintiff hereby incorporates by reference, as though fully set forth herein, paragraphs 1-241, and alleges as follows.

279.  At all times material, Defendants owed a duty to their passengers, including Plaintiff IRIS HOUSE and Decedent MICHAEL HOUSE, to exercise reasonable care for the health, welfare, and safety of their passengers.

280.  At all times material, Defendants' duty of reasonable care under the circumstances included, but was not limited to, providing their passengers, including Plaintiff IRIS HOUSE and Decedent MICHAEL HOUSE timely and adequate warnings of hazardous conditions on the vessel, including passengers with highly infectious diseases such as COVID-19 that Defendants knew and/or should have known about upon reasonable inspection. Defendants' failure to do so foreseeably and proximately cause harm to Plaintiff IRIS HOUSE, and foreseeably and proximately caused harm to (and the death of) MICHAEL HOUSE.

281.  At all times material, Defendants, by and through its vessel, crew, agents, servants, officers, staff and/or employees, who were acting in the course and scope of their employment and/or agency, undertook to create a dangerous and hazardous condition.

282.  Defendants knew or should have known of the actual, unique risk of viral contagion of COVID-19 aboard cruise ships, and, in light of the situation on the *DIAMOND PRINCESS* only three weeks prior to the instant voyage on the *GRAND PRINCESS*, Defendants knew or should have known that it was especially dangerous to expose Plaintiff IRIS HOUSE and Decedent MICHAEL HOUSE to COVID-19.

283.   Defendants also knew or should have known that passengers aboard the San Francisco-to-Mexico trip on the *GRAND PRINCESS* had experienced symptoms of COVID-19 and were eventually diagnosed with COVID-19.

284.   Nevertheless, Defendants chose to board Plaintiff IRIS HOUSE and MICHAEL HOUSE onto the *GRAND PRINCESS* on February 21, 2020 without instituting any procedures for medical screening or examination. Defendants then chose to embark upon the Hawaii-bound voyage, essentially trapping Plaintiffs on a vessel infested with COVID-19, and likely exacerbated the spread of the virus aboard the ship. Throughout the duration of the trip, Defendants continually and repeatedly acted or failed to act in ways that caused Plaintiffs to be exposed to COVID-19, including but not limited to:  failing to take any effective actions to prevent or mitigate the spread of COVID-19 throughout the crew members and/or passengers; failing to alert passengers to the possibility of infection aboard the ship; and hosting and encouraging participation in large group activities and events that Defendants knew could lead to large-scale infection among the crew and passengers.

285.   These choices by Defendants created a dangerous and threatening environment in which Plaintiff IRIS HOUSE and MICHAEL HOUSE were forced to live on for two weeks, at all times directly exposed to COVID-19 and at risk of becoming infected with, made ill by, and/or spreading COVID-19.

286.   As the direct and proximate result of Defendants' actions and omissions throughout the duration of their voyage aboard the *GRAND PRINCESS*, Plaintiff IRIS HOUSE and decedent MICHAEL HOUSE were in the "zone of danger," where they were directly exposed to a lethal virus, and placed at immediate risk of—and actually suffered—actual physical harm as a result of their direct and prolonged exposure to COVID-19.

287.   As a result of this exposure, which was directly and proximately caused by Defendants' acts and omissions, Plaintiff IRIS HOUSE suffered severe emotional and mental harm, of the nature and type that reasonable persons would suffer under

the circumstances alleged in this Complaint, when she was forced to watch her husband, MICHAEL HOUSE, the first and only love of her life, slowly and painfully deteriorate, as COVID-19 destroyed his vital organs, and ultimately took his life.

288.   As result of this exposure, which was directly and proximately caused by Defendants' acts and omissions, Plaintiff IRIS HOUSE, suffered serious physical injuries, when she was infected on the *GRAND PRICESS* with COVID-19, and suffered physical symptoms including high fever and loss of her sense of taste. At all times material, Plaintiff IRIS HOUSE was at all times concerned for her own safety and well-being, and continues to expect that she may begin exhibiting symptoms or health complications not yet identified as a result of COVID-19.

289.   As a further direct and proximate result of Defendants' gross negligence, Plaintiff IRIS HOUSE, has suffered and continues to suffer from emotional distress of the nature and type that reasonable persons would suffer under the circumstances, including but not limited to, suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation and shame related to her own risk of future health complications arising from having contracted COVID-19, and related to witnessing her husband MICHAEL HOUSE's, the first and only love of her life, slowly and painfully deteriorate, as COVID-19 destroyed his vital organs, and ultimately took his life.

290.   Plaintiff IRIS HOUSE was traumatized by the reasonable apprehension of her husband  and fellow passengers developing COVID-19 and by the threat to her own health after becoming infected with the virus, suffering future negative health outcomes or complications related to exposure to and/or contraction of the virus.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, and for each of them, as follows:

1.     For pecuniary and non-pecuniary damages under the General Maritime Law of the United States and California Law.

2.      For pre-death pain and suffering survival damages to the successors in interest of decedent MICHAEL HOUSE, including IRIS HOUSE, ANDREW HOUSE, and ELTON HOUSE, pursuant to *Evich v. Connelly*, 759 F. 2d 1432, 1434 (9th Cir. 1985), *Evich v. Morris*, 819 F.2d 256, 258 (9th Cir. 1987), and *Davis v. Bender Shipbuilding and Repair Co.*, 27 F.3d 426, 430 (9th Cir. 1994).

3.      To IRIS HOUSE, as surviving wife and successor in interest of decedent MICHAEL HOUSE, wrongful death damages outlined under *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375 (1970), and *Sea-Land Services, Inc. v. Gaudet*, 414 U.S. 573 (1974), including, but not limited to: Financial support that MICHAEL HOUSE would have contributed to her, during MICHAEL HOUSE's life expectancy before his death; Loss of gifts or benefits that IRIS HOUSE would have expected to receive from MICHAEL HOUSE; Funeral and burial expenses; Reasonable value of household services that MICHAEL HOUSE would have provided; Loss of MICHAEL HOUSE's love, companionship, comfort, care, assistance, protection, affection, society, and moral support; Loss of enjoyment of marital relations, and Loss of MICHAEL HOUSE's training and guidance;

4.      To IRIS HOUSE, individually, damages for past and future medical expenses, pain and suffering, disability, mental anguish, inconvenience, the loss of capacity for enjoyment of life, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation, and shame.

5.      To ELTON HOUSE, as surviving son, and successor in interest of decedent MICHAEL HOUSE,  wrongful death damages outlined under *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375 (1970), and *Sea-Land Services, Inc. v. Gaudet*, 414 U.S. 573 (1974), including, but not limited to: Financial support that MICHAEL HOUSE would have contributed to him, during MICHAEL HOUSE's life expectancy before his death; Loss of gifts or benefits that ELTON HOUSE would have expected to receive from MICHAEL HOUSE; Funeral and burial expenses; Reasonable value of household services that MICHAEL HOUSE would have

provided; Loss of MICHAEL HOUSE's love, companionship, comfort, care, assistance, protection, affection, and moral support; and Loss of MICHAEL HOUSE's training and guidance;

6.     To ANDREW HOUSE, as surviving son, and successor in interest of decedent MICHAEL HOUSE,  wrongful death damages outlined under *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375 (1970), and *Sea-Land Services, Inc. v. Gaudet*, 414 U.S. 573 (1974), including, but not limited to: Financial support that MICHAEL HOUSE would have contributed to him, during MICHAEL HOUSE's life expectancy before his death; Loss of gifts or benefits that ANDREW HOUSE would have expected to receive from MICHAEL HOUSE; Funeral and burial expenses; Reasonable value of household services that MICHAEL HOUSE would have provided; Loss of MICHAEL HOUSE's love, companionship, comfort, care, assistance, protection, affection, and moral support; and Loss of MICHAEL HOUSE's training and guidance;

7.     For prejudgment interest as allowed by law;

8.     For costs of suit incurred herein;

6.      For such other and further relief as the Court may deem proper.

NELSON & FRAENKEL, LLP

By:   *s/Carlos F. Llinás Negret*
        Carlos F. Llinás Negret
        *Attorneys for Plaintiff*

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury.

Date: February 21, 2021.

NELSON & FRAENKEL, LLP

By:   *s/ Carlos F. Llinás Negret*
        Carlos F. Llinás Negret
        *Attorneys for Plaintiff*